UNITED SATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

SEAVIEW PLACE DEVELOPERS, INC.,         Case No. 8:11-bk-05126-___

Debtor.                                  Chapter 11
_____/

# DEBTOR'S CHAPTER 11 CASE MANAGEMENT SUMMARY

Seaview Place Developers, Inc. ("Debtor" or "Seaview"), by counsel, hereby files its Case Management Summary pursuant to the *Administrative Order Establishing Initial Procedures in Chapter 11 Cases Filed in the United States Bankruptcy Court of the Middle District of Florida, Tampa-2009-1 (Administrative Order dated January 28, 2009)*, and states as follows:

## I. Debtor's Business

1. The Debtor, a Florida corporation founded in 2005, developed, built, owns, and now manages a nine-story, waterfront high-rise condominium (the "Seaview Building") in Pasco County, Florida commonly known as Seaview Place.

2. The Seaview Building has a total of 151 condominium units (the "Seaview Units"), which range in size from an 830 square foot one-bedroom unit, to a 1,910 square foot three-bedroom unit. Amenities to the Seaview Building include a lobby area, clubroom, fitness center, swimming pool and spa, sauna, aerobics, private garages, business center/library, water frontage, asphalt paved drives and parking, a "green area," and a nearby 45-slip marina (collectively, the "Seaview Project"). Approximately 31 of the units in the Seaview Building are occupied by residents, with Seaview leasing

approximately five of those units to tenants. The Debtor is currently in the business of selling the Seaview Units and operating the Seaview Project.

## II. History of the Debtor

3. The history of Seaview centers on certain loans from Colonial Bank ("Colonial") relating to the construction of the Seaview Building. The Debtor constructed the Seaview Building between 2006 and 2008 which was funded, in part, by a construction loan from Colonial in the original principal amount of approximately $22 Million (the "Seaview Loan").

4. Colonial also provided additional loans (totaling roughly $6.64 Million) to certain affiliated entities of the Debtor, including Harbor Colony Development, Inc. ("Harbor") and Gulf Landings Development Corporation ("Gulf"). Those loans to Seaview's affiliates were primarily used by Harbor and Gulf for the acquisition and development of real property adjacent to the Seaview Project.[1]

5. These various loans with Colonial were purportedly cross-collateralized and cross-defaulted with each other and with the Seaview Loan, and secured by mortgage liens encumbering the respective parcels of land (collectively with the Seaview Loan, the "Colonial Loans"). These Colonial Loans also appear to be guaranteed by certain of the Debtor's affiliates and its principals, Joe and Marlene Borda. The Debtor believes that at all times each of these Colonial Loans have been, at a minimum, fully secured by the value of the subject collateral.

---

[1] Specifically, Gulf is a Florida corporation founded in 1985, primarily engaged in the business of developing two parcels of unimproved land adjacent to the Seaview Project, which have been zoned for commercial and residential construction, and has other valuable entitlements. Harbor is a Florida corporation founded in 2005 and is primarily engaged in the business of developing and selling single-family lots, and has completed an 18-slip marina on its adjacent parcel of property.

6. It appears that after Colonial failed, Branch Banking & Trust Company ("BB&T" or the "Lender") acquired the Colonial Loans sometime in 2009 as part of BB&T's acquisition of Colonial's assets through the FDIC's receivership of Colonial.

7. Historically, the operating and maintenance expenses necessary for the Seaview Project (the "O&M Expenses"), as well as a portion of debt service on the Colonial Loans, was paid from a considerable expense reserve account created in connection with certain amendments to the Seaview Loan (the "Reserve Account").

8. At various times (most recently in early 2011), BB&T refused to allow the Reserve Account to be used to pay the O&M Expenses. Accordingly, at those times, certain of the Debtor's affiliates have been forced to provide loans to the Debtor so that it could pay the monthly expenses required to maintain the Seaview Building and preserve the value of the Seaview Project (approximately $40,000 to $50,000). These loans from the Debtor's affiliates now total approximately $4,000,000 and have been used to fund Seaview's O&M Expenses, debt service to BB&T, and even the development and construction of the various amenities benefiting the Seaview Project, such as boat docks.

9. Interestingly, the Debtor had never been declared in default under the Colonial Loans until after BB&T acquired them. It was only after BB&T acquired the Colonial Loans that the disputes arose between the Debtor and BB&T which have precipitated this bankruptcy case.

10. Specifically, those disputes mainly involved disagreements among the parties relating to BB&T's obligations to provide (1) "end-loans" to potential buyers of Seaview Units ("End Loans"), and (2) certain reductions to the "release prices" for the

Seaview Units in light of the current market conditions ("Release Price Modifications"). The Debtor believes those accommodations are contemplated by agreements and understandings underlying the Seaview Loan and has attempted for months to negotiate a consensual resolution to those disputes. Nevertheless, BB&T has refused to abide by its commitment to make reasonable accommodations regarding the End Loans and Release Price Modifications, making it virtually impossible for the Debtor to sell the Seaview Units.

11. The Debtor's disputes with BB&T came to a head in connection with negotiations for the renewal and extension of the Colonial Loans toward the end of 2010. Exacerbating the situation was BB&T's recent election to apply most, if not all, of the funds remaining in the Reserve Account to pay a portion of the Seaview Loan, rather than using it to fund the recurring monthly O&M Expenses.

### III. Current Business Challenges and Opportunities

12. While the Debtor receives a small amount of income from its rental of a few Seaview Units and from maintenance fees paid by the occupants of the Seaview Building, its primary source of revenue is designed to be income from selling the Seaview Units. Particularly given the decline in Florida's real estate markets in the last few years, without providing some form of End Loan financing to potential buyers of the Seaview Units and reasonable Release Price Modifications, BB&T has effectively paralyzed the Debtor's business.

13. Worse yet, BB&T's actions over the last year have affirmatively created additional challenges that the Debtor is now attempting to overcome. As one example,

BB&T and the Debtor agreed to conduct an auction in mid-2010 in an attempt to stoke demand for the Seaview Units. On June 18, 2010 (the "Auction Date"), after months of marketing, preparing, and expense, the Debtor commenced the auction as agreed. The Debtor did so largely in reliance on BB&T's commitment to provide at the auction needed End Loan financing to potential buyers of the auctioned Seaview Units, and to provide the requested Release Price Modifications. In fact, the Debtor had submitted requests to BB&T to reduce the release prices months prior to that auction. However, on or about the Auction Date, the Debtor was informed that no representative of BB&T was available to approve the necessary Release Price Modifications at that auction. BB&T likewise did not make available the promised End Loans necessary to close sales of the Seaview Units in connection with the auction. Consequently, the auction was a total failure -- the Debtor did not sell even one Seaview Unit. In addition to the obvious lost sales, BB&T's acts in connection with that auction caused the Debtor to suffer significant damage to its reputation and good will in the real estate community, and may have caused a diminution in the value of the Seaview Project.

14.     Even in this economy, the Debtor believes there is significant demand for the type of "high end" condominiums available at the Seaview Project. The Debtor has a tremendous opportunity to tap into that demand if it can use the bankruptcy to compel and facilitate the sales of the Seaview Units.

**IV.     Existing Debt and Equity Structure**

15.     As described above, the Debtor's debt structure is largely governed by the Colonial Loans. BB&T, as Colonial's successor-in-interest, asserts a secured claim

against Seaview in the approximate amount of around $14.77 Million, secured by a mortgage on the Seaview Building, and personal property of Seaview.

16. The Debtor believes the Pasco County Tax Collector is owed approximately $222,850.00 for aggregate property taxes in connection with the Seaview Project.

17. As for its equity structure, J&M Development Concepts, LLC ("J&M" or the "Parent Company") is the sole shareholder of the Debtor, as well as the sole shareholder of non-debtor affiliates Gulf and Harbor.

18. Based on an April 2010 appraisal commissioned by BB&T, the Seaview Building has a discounted sellout (i.e., "bulk sale") value of $23,750,000, and the docks owned by Seaview additionally have a "discounted sellout value" of another $1,000,000. Therefore, based in part on BB&T's own appraisals, the Debtor believes there is significant equity in its assets.

**V.     Location of Debtor's Operations**

19. The principal place of business for the Debtor is 4516 Seagull Drive, New Port Richey, Florida 34652.

**VI.    Reasons for Filing Chapter 11**

20. As detailed above, BB&T's actions have crippled the Debtor's ability to generate meaningful sales revenue. Ironically, Seaview must be able to sell the Seaview Units in order to fund operations and repay its debt to BB&T. In order to accomplish those objectives, and maximize the value of the Seaview Project for all parties-in-interest,

the Debtor determined that a chapter 11 bankruptcy offered it the greatest chance of success.

### VII. List of Officers and Directors, Salaries, and Benefits

21. Joseph "Joe" Borda is the President of the Debtor. Mr. Borda has over 45 years of experience as a successful engineer, architect, and developer. For roughly twenty-five of those years, Mr. Borda has spent working in Pasco County, Florida developing and selling properties like the Seaview Project. Mr. Borda has significant responsibility for the long-range planning, the marketing and sale of the Seaview Units, and day-to-day operations of Seaview. Nevertheless, Mr. Borda has not taken a salary from Seaview in the year prior to the filing of this case. Mr. Borda does not intend to take any post-petition salary or benefits from Seaview.

22. Marlene Borda is the wife of Joseph Borda and serves as the Secretary of the Debtor. Mrs. Borda handles many aspects of the Debtor's day-to-day operations. Mrs. Borda is paid through Seaview's payroll company and received a mere $290.00 a week. Mrs. Borda intends to request post-petition compensation, including standard benefits received pre-petition from Seaview.

### VIII. Debtor's Annual Gross Revenues

23. Seaview had approximately $874,350.00 in annual gross revenue for the fiscal year that ended December 31, 2010.

**IX.   Amounts Owed to Various Classes of Creditors**

24.    Seaview has secured claims totaling approximately $15,056,478.00 (comprised almost entirely of the Colonial Loans), and unsecured claims of approximately $90,635.84.

**X.    General Description and Approximate Value of the Debtor's Current and Fixed Assets**

25.    The Debtor's fixed assets include real property and a marina valued in excess of $24 Million, and *de minimus* personal property.

**XI.   Number of Employees and Amounts of Wages Owed as of Petition Date**

26.    The Debtor has approximately five employees, including Joe and Marlene Borda. The Debtor is current with payroll as of the Petition Date.

**XII.  Status of Debtor's Payroll and Sales Tax Obligations**

27.    To the best of its knowledge, the Debtor is current with payroll and sales tax obligations.

**XIII. Anticipated Emergency Relief to be Requested Within 14 Days from the Petition Date**

*Debtor's Emergency Motion for Authority to Obtain Post-Petition Financing*;

*Debtor's Emergency Motion for Order Authorizing Payment of Pre-Petition Wages, Salaries, Benefits, Related Taxes, Tax Deposits, and Payroll Service Fees;*

*Debtor's Emergency Motion for Order Pursuant to 11 U.S.C. §§ 105 and 366 (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Services on Account Pre-Petition Invoices, (II) Approving Proposed Form of Adequate Assurance of Payment, and (III) Establishing Procedures for Determining Request for Additional Assurance of Payment*;

*Debtor's Emergency Motion for Authority to Pay Officer's Compensation, Benefits, and Related Taxes and Tax Deposits*; and

*Debtor's Application for Interim and Final Orders Authorizing Employment of Jennis & Bowen, P.L. as Counsel for Debtor.*

Dated this 22nd day of March 2011.

                          */s/ Chad S. Bowen*
                          Chad S. Bowen
                          Florida Bar No. 0138290
                          Suzy Tate
                          Florida Bar No. 22071
                          **Jennis & Bowen, P.L.**
                          400 N. Ashley Dr., Ste. 2540
                          Tampa, FL  33602
                          Telephone: 813) 229-1700
                          Facsimile: (813) 229-1707
                          cbowen@jennisbowen.com
                          state@jennisbowen.com
                          Attorneys for the Debtor
                          and Debtor-in-Possession

## **CERTIFICATE OF SERVICE**

    I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by CM/ECF electronic service to **United States Trustee**, 501 E. Polk St., Ste. 1200, Tampa, FL  33602 and to those parties receiving electronic notices via CM/ECF on this 22nd day of March 2011.

                          */s/ Chad S. Bowen*
                          Chad S. Bowen