UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

|                                              |                                            |
|----------------------------------------------|--------------------------------------------|
|                                              | Chapter 11                                 |
| SEAVIEW PLACE DEVELOPERS, INC.,              | Case No. 8:11-bk-5126-KRM [Lead Case]      |
| GULF LANDINGS DEVELOPMENT                    | Case No. 8:11-bk-13101-KRM                 |
| CORPORATION,                                 |                                            |
| HARBOR COLONY DEVELOPMENT,                   | Case No. 8: 11-bk-13103-KRM                |
| INC.,                                        |                                            |
|                                              | (Jointly Administered Cases)               |
|              Debtors.                        |                                            |
| _____/          |                                            |

**FIRST AMENDED DISCLOSURE STATEMENT IN CONNECTION WITH
FIRST AMENDED JOINT PLAN OF REORGANIZATION OF
SEAVIEW PLACE DEVELOPERS, INC.,
GULF LANDINGS DEVELOPMENT CORPORATION, AND
HARBOR COLONY DEVELOPMENT, INC.**

<div style="margin-left:40%">

Chad S. Bowen
Florida Bar No. 0138290
Suzy Tate
Florida Bar No. 22071
**Jennis & Bowen, P.L.**
400 N. Ashley Dr., Ste. 2540
Tampa, FL 33602
Telephone: (813) 229-1700
Facsimile: (813) 229-1707
Email: cbowen@jennisbowen.com
Counsel to the Debtors and
Debtors-in-Possession

</div>

Dated: October 14, 2011

THIS FIRST AMENDED DISCLOSURE STATEMENT HAS NOT BEEN CONDITIONALLY APPROVED BY THE BANKRUPTCY COURT. THE CONSOLIDATED HEARING TO CONSIDER THE ADEQUACY OF THIS FIRST AMENDED DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND CONFIRMATION OF THE FIRST AMENDED JOINT PLAN OF REORGANIZATION PURSUANT TO SECTION 1129 OF THE BANKRUPTCY CODE **IS CURRENTLY SCHEDULED FOR _____, 2011 AT ____.M. EASTERN TIME.** THE DEBTORS RESERVE THE RIGHT TO MODIFY AND SUPPLEMENT THIS FIRST AMENDED DISCLOSURE STATEMENT AND THE ACCOMPANYING FIRST AMENDED JOINT PLAN OF REORGANIZATION UP TO AND INCLUDING THE TIME OF CONFIRMATION OF THE FIRST AMENDED JOINT PLAN OF REORGANIZATION. THE DEBTORS ARE NOT CURRENTLY SOLICITING VOTES ON THE FIRST AMENDED JOINT PLAN OF REORGANIZATION.

# DISCLAIMER

THE INFORMATION CONTAINED IN THIS FIRST AMENDED DISCLOSURE STATEMENT IS PROVIDED FOR PURPOSES OF SOLICITING VOTES ON THE *FIRST AMENDED JOINT PLAN OF REORGANIZATION OF SEAVIEW PLACE DEVELOPERS, INC., GULF LANDINGS DEVELOPMENT CORPORATION, AND HARBOR COLONY DEVELOPMENT, INC.* (THE "<u>PLAN</u>").  THE INFORMATION MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR SOLICITATION OF VOTES ON THE PLAN.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE STATED, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT WILL BE CORRECT AT ANY TIME AFTERWARDS.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING SECURITIES OR CLAIMS AGAINST SEAVIEW PLACE DEVELOPERS, INC., GULF LANDINGS DEVELOPMENT CORPORATION, AND/OR HARBOR COLONY DEVELOPMENT, INC., OR ANY OF THE DEBTORS-IN-POSSESSION IN THESE CASES, SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE.  THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN SEAVIEW PLACE DEVELOPERS, INC., GULF LANDINGS DEVELOPMENT CORPORATION, OR HARBOR COLONY DEVELOPMENT, INC., OR ANY OF THE DEBTORS-IN-POSSESSION IN THESE CASES.

**TABLE OF CONTENTS**

I.      PRELIMINARY STATEMENT ................................................................. 1
II.     PURPOSE OF THE DISCLOSURE STATEMENT ............................... 1
III.    THE CHAPTER 11 PROCESS ............................................................... 3
        A.   Explanation of the Reorganization Process. .............................. 3
        B.   Approval of Disclosure Statement. ............................................. 4
        C.   Voting Procedures. ......................................................................... 4
        D.   Confirmation. ................................................................................... 5
        E.   Procedure for Filing Proofs of Claim and Proofs of Equity Interest. ........ 6
IV.     INFORMATION REGARDING THE DEBTOR ................................... 7
        A.   Overview and History of the Debtors. ........................................ 7
        B.   Significant Events in the Reorganization Cases. ..................... 10
V.      MEANS FOR EXECUTION OF PLAN ............................................... 11
        A.   Plan Funding. ................................................................................. 11
        B.   Substantive Consolidation .......................................................... 12
VI.     CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY
        INTERESTS UNDER THE PLAN .................................................... 13
VII.    CLAIMS ALLOWANCE AND PAYMENT, EXECUTORY CONTRACTS,
        REVESTING OF ASSETS ................................................................ 18
        A.   Allowed Claims, Distribution Rights, and Objections to Claims. ......... 18
        B.   Disposition of Executory Contracts .......................................... 22
        C.   Revesting of Assets; Release of Liens ...................................... 23
VIII.   POST-CONSUMMATION CORPORATE STRUCTURE, MANAGEMENT,
        OPERATION, AND DISCHARGE INJUNCTIONS .......................... 23
        A.   Continued Corporate Existence ................................................. 23
        B.   Post-Consummation Governance Documents .......................... 23
        C.   Officers and Directors of Reorganized Debtors ...................... 23
        D.   Corporate Action ........................................................................... 24
        E.   Discharge and Discharge Injunction ......................................... 24
IX.     PREFERENCES, FRAUDULENT CONVEYANCES, AND OTHER CAUSES
        OF ACTION ...................................................................................... 27
X.      RISK FACTORS TO BE CONSIDERED ........................................... 28
        A.   General Bankruptcy Risk Factors ............................................. 28
        B.   Uncertainty of Plan Assumptions ............................................. 29
        C.   Operational Risk Factors ............................................................ 29
XI.     CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ... 30
        A.   General ............................................................................................ 30
        B.   Certain U.S. Federal Income Tax Consequences to Holders of Claims and
             Equity Interests. ........................................................................... 30
        C.   Certain U.S. Federal Income Tax Consequences of the Plan to the Debtor ...... 31
        D.   Backup Withholding and Reporting .......................................... 33
        E.   IRS Circular 230 Notice ............................................................... 33
XII.    FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS ... 33
        A.   Feasibility of the Plan ................................................................. 33
        B.   Liquidation Analysis ..................................................................... 34

**XIII.**      **<u>SUMMARY, RECOMMENDATION, AND CONCLUSION</u>** ........................... 35

# I.  PRELIMINARY STATEMENT

This First Amended Disclosure Statement is submitted by Seaview Place Developers, Inc. ("Seaview"), Gulf Landings Development Corporation ("Gulf"), and Harbor Colony Development, Inc. ("Harbor") (collectively, the "Debtors") pursuant to Section 1125 of the Bankruptcy Code in connection with the *First Amended Joint Plan of Reorganization of Seaview Place Developers, Inc.*, *Gulf Landings Development Corporation, and Harbor Colony Development, Inc.* dated as of October 14, 2011 (the "Plan"), proposed by the Debtors in their efforts to reorganize under Chapter 11 of the Bankruptcy Code.  A copy of the Plan is attached as **Exhibit "A."**  The original *Disclosure Statement in Connection with Joint Plan of Reorganization of Seaview Place Developers, Inc., Gulf Landings Development Corporation, and Harbor Colony Development, Inc.* (Doc. No. 89) and the *Joint Plan of Reorganization of Seaview Place Developers, Inc., Gulf Landings Development Corporation, and Harbor Colony Development, Inc.* (Doc. No. 88), previously filed in these Bankruptcy Cases have been withdrawn and are superseded and replaced by the *First Amended Joint Plan of Reorganization of Seaview Place Developers, Inc., Gulf Landings Development Corporation, and Harbor Colony Development, Inc.* and this Disclosure Statement.  For purposes hereof, all capitalized terms used in this Disclosure Statement, and not otherwise separately defined herein, shall have the same meanings as such terms have in the Plan.  Such meanings shall be equally applicable to both the singular and plural forms of such terms.

The Plan essentially proposes a consensual "partial giveback" to BB&T of Property that the Debtors and BB&T have agreed has a value as of the Effective Date sufficient to fully satisfy BB&T's Claims.  Because the Debtors anticipate that the value of the Debtors' Property, even under a conservative valuation, is greater than the amount of Secured Claims encumbering that Property, the Plan proposes that the Debtors will retain a certain amount of their Property (consisting primarily of certain parcels of undeveloped Real Property) that will be marketed and ultimately sold following the Effective Date, and which, in addition to Exit Financing (if needed), will generate sufficient funds to fully pay the Allowed Claims of Unsecured Creditors.  To accomplish this result, the Plan also contemplates that the Debtors may, prior to or through Confirmation, substantively consolidate their cases for the purposes of future reporting, voting, and making Distributions under the Plan.  Substantive consolidation would also resolve various substantial Intercompany Claims and maximize the recovery of Unsecured Creditors as more specifically described below.

# II.  PURPOSE OF THE DISCLOSURE STATEMENT

This Disclosure Statement sets forth certain information regarding (a) the Debtors' pre-petition and post-petition operating and financial history, (b) their reasons for seeking protection and reorganization under Chapter 11, (c) significant events that have occurred and steps taken during the Reorganization Cases to facilitate the Debtors' reorganization, (d) discussions reflecting the Debtors' anticipated operations and financing upon their successful emergence from Chapter 11 showing how the Plan may be consummated, (e) "liquidation analysis" demonstrating the recoveries if the Debtors were liquidated rather than reorganized, (f) various possible Federal tax consequences, and (g) estimates of the total administrative costs and expenses that may be incurred in connection with the Reorganization Cases.  This Disclosure

Statement also describes certain terms and provisions of the Plan, certain effects of Confirmation of the Plan, certain risk factors associated with the Plan and procedures for resolutions of Claims against the Debtors and the manner in which Distributions will be made under the Plan. In addition, this Disclosure Statement discusses the Confirmation process and the voting procedures that Holders of Claims entitled to vote under the Plan must follow for their votes to be counted.

By Order dated _____, 2011, the Bankruptcy Court has conditionally approved this Disclosure Statement as containing information of a kind, and in sufficient detail, adequate to enable a hypothetical reasonable investor typical of the Holders of Claims and Equity Interests in the Classes entitled to vote pursuant to the Plan to make an informed judgment whether to accept or reject the Plan. **CONDITIONAL APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

**NO USE OF THE STATEMENTS OR INFORMATION CONCERNING THE DEBTORS (PARTICULARLY AS TO FUTURE BUSINESS, RESULTS OF OPERATIONS OR FINANCIAL CONDITION, OR WITH RESPECT TO DISTRIBUTIONS TO BE MADE UNDER THE PLAN) OR ANY OF THEIR ASSETS, VALUATIONS, PROPERTIES, OR BUSINESSES THAT IS GIVEN FOR THE PURPOSE OF SOLICITING ACCEPTANCE OF THE PLAN IS AUTHORIZED, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. THE STATEMENTS AND THE FINANCIAL INFORMATION OF THE DEBTORS, INCLUDING ALL FINANCIAL ASSUMPTIONS AND INFORMATION REGARDING CLAIMS OR EQUITY INTERESTS CONTAINED HEREIN, HAVE BEEN PREPARED FROM DOCUMENTS AND INFORMATION PREPARED BY THE DEBTORS OR PROVIDED TO THE DEBTORS' PROFESSIONALS BY THE DEBTORS. THE DEBTORS HAVE NOT TAKEN ANY INDEPENDENT ACTION TO VERIFY THE ACCURACY OR COMPLETENESS OF SUCH STATEMENTS AND INFORMATION AND EXPRESSLY DISCLAIM ANY REPRESENTATION CONCERNING THE ACCURACY OR COMPLETENESS THEREOF.**

**THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE IN CONNECTION WITH THE PLAN SHALL, UNDER ANY CIRCUMSTANCES, CREATE AN INFERENCE THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE THE DATE THE DISCLOSURE STATEMENT AND THE MATERIALS RELIED UPON IN PREPARATION OF THE DISCLOSURE STATEMENT WERE COMPILED.**

**THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE IN FAVOR OF OR AGAINST THE PLAN, AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED EVIDENCE OF THE TAX OR OTHER LEGAL**

CONSEQUENCES OR EFFECTS OF THE REORGANIZATION OF THE DEBTORS. CERTAIN INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, BY ITS NATURE, IS A FORECAST OF FUTURE EVENTS AND, THEREFORE, INCLUDES ESTIMATES AND ASSUMPTIONS, WHICH MAY PROVE TO BE WRONG, OR WHICH MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS.

EACH HOLDER OF A CLAIM OR EQUITY INTEREST SHOULD CONSULT SUCH HOLDER'S ATTORNEY AND ACCOUNTANT AS TO THE EFFECT OF THE PLAN ON SUCH HOLDER INCLUDING, BUT NOT LIMITED TO, THE TAX EFFECTS OF THE PLAN.

IT IS OF THE UTMOST IMPORTANCE TO THE DEBTORS THAT YOU VOTE PROMPTLY TO ACCEPT THE PLAN BY COMPLETING AND SIGNING THE BALLOT ENCLOSED HEREWITH AND FILING IT WITH THE UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF FLORIDA, 801 NORTH FLORIDA AVENUE, TAMPA, FLORIDA 33602, <u>ON OR BEFORE 4:00 P.M. EASTERN TIME ON _____, 2011.</u>

THE DEBTORS BELIEVE THAT IT IS IN THE BEST INTERESTS OF ALL PARTIES TO VOTE TO ACCEPT THE PLAN BECAUSE THE PLAN FAIRLY AND EQUITABLY TREATS ALL HOLDERS OF CLAIMS BY PROVIDING THE EARLIEST POSSIBLE AND MAXIMUM RECOVERY TO SUCH HOLDERS.

## III.    THE CHAPTER 11 PROCESS

A.    <u>Explanation of the Reorganization Process</u>.

Chapter 11 of the Bankruptcy Code contemplates the formulation of a plan of reorganization and outlines how a debtor's debts will be paid. Unlike cases under Chapter 7, 12, or 13 of the Bankruptcy Code, a trustee is not ordinarily appointed in a Chapter 11 case. Instead, the debtor remains in control of its assets and business affairs as a "debtor-in-possession" with most of the powers and duties of a trustee. In addition to statutory requirements relating to plan formulation, confirmation, and post-confirmation matters, a Chapter 11 case is also shaped by statutory prohibitions against collection efforts or enforcement actions by creditors in order to allow the debtor breathing space within which to reorganize. The Bankruptcy Code contains a number of other significant provisions applicable to reorganization cases, such as those relating to post-petition financing and pre-petition Executory Contracts, which confer powers on the debtor-in-possession and also provides creditors with certain rights and remedies.

Formulation of a plan of reorganization is the principal purpose of a Chapter 11 case. A plan of reorganization sets forth the means by which claims against, and interests in, the debtor will be satisfied. After a plan of reorganization has been filed, it must be accepted by holders of claims against, or interests in, the debtor. Section 1125 of the Bankruptcy Code requires full disclosure before solicitation of acceptances of a plan of reorganization. This Disclosure Statement is presented to Holders of Claims and Equity Interests to satisfy the disclosure requirements of Section 1125 of the Bankruptcy Code.

**B.      Approval of Disclosure Statement.**

On _____, 2011, the Bankruptcy Court entered its *Order Conditionally Approving Disclosure Statement, Fixing Time to File Objections to the Disclosure Statement, Fixing Time to File Applications for Administrative Expenses, Setting Hearing on Confirmation of the Plan, and Setting Deadlines with Respect to Confirmation Hearing* (Doc. No. ___) (the "Disclosure Statement Order").  Pursuant to the Disclosure Statement Order, the Bankruptcy Court has conditionally approved the Disclosure Statement as containing "adequate information" (i.e., information of a kind and in sufficient detail to enable a hypothetical reasonable creditor typical of the Holders of Claims and Equity Interests to make an informed judgment whether to accept the Plan).   However, this conditional approval is subject to objections to this Disclosure Statement (if any) which will be considered by the Bankruptcy Court, together with Confirmation of the Plan, at a combined hearing on _____, **2011 at _____.m. Eastern Time.**

**C.      Voting Procedures.**

(1)      Persons Entitled to Vote.  Pursuant to the provisions of the Bankruptcy Code, only classes of Claims and Equity Interests that are Impaired under the terms and provisions of the Plan are entitled to vote to accept or reject the Plan.  Furthermore, if a Class of Claims or Equity Interests is not entitled to receive any Distribution under the Plan, such Class is deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Holders of Disputed Claims are not entitled to vote on the Plan unless the Bankruptcy Court, upon motion of such Holder, temporarily allows the Claim in the Estimated Amount defined by the Court for purposes of voting to accept or reject the Plan.

(2)      Voting Instructions.

(i)      **Ballots**.  In voting for or against the Plan, please use only the ballot or ballots sent to you with this Disclosure Statement.  If you have Claims or Equity Interests in more than one Class, you may receive multiple ballots.  IF YOU RECEIVE MORE THAN ONE BALLOT, YOU SHOULD ASSUME THAT EACH BALLOT IS FOR A SEPARATE CLAIM OR EQUITY INTEREST AND YOU SHOULD COMPLETE AND RETURN ALL BALLOTS.   **IN CONNECTION WITH THE DEBTORS' PLAN, HOLDERS OF CLASS 5 UNSECURED CLAIMS MUST ELECT ONE OF TWO ALTERNATIVE TREATMENTS UNDER THE PLAN BY SO INDICATING IN THE APPROPRIATE PLACE ON THEIR BALLOT:  (OPTION 1) TO HAVE THEIR ALLOWED UNSECURED CLASS 5 CLAIM PAID OVER TIME IN FULL (PLUS INTEREST) OR, (OPTION 2) WITH THE DEBTORS' CONSENT, HAVE SUCH CLAIM FULLY SATISFIED THROUGH A ONE-TIME LUMP SUM CASH PAYMENT OF SEVENTY-FIVE PERCENT (75%) OF THE ALLOWED AMOUNT OF SUCH HOLDER'S CLASS 5 CLAIM (WITHOUT INTEREST) WITHIN FORTY-FIVE (45) DAYS FOLLOWING THE EFFECTIVE DATE.   THE FAILURE OF A CLASS 5 CREDITOR TO CLEARLY INDICATE ITS ELECTION ON THE BALLOT SHALL BE PRESUMED TO BE AN ELECTION OF OPTION 1, DESCRIBED ABOVE. NOTWITHSTANDING ANYTHING TO THE CONTRARY, AN ELECTION BY THE HOLDER OF AN ALLOWED CLASS 5 CLAIM TO ACCEPT OPTION 2 SHALL,**

UPON THE DEBTORS' CONSENT TO SUCH TREATMENT, BE IRREVOCABLY DEEMED A VOTE ACCEPTING THE PLAN BY SUCH CREDITOR.

(ii) **Returning Ballots**. YOU SHOULD COMPLETE AND SIGN EACH ENCLOSED BALLOT AND FILE IT WITH THE UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF FLORIDA, 801 NORTH FLORIDA AVENUE, TAMPA, FLORIDA 33602, <u>ON OR BEFORE 4:00 P.M., EASTERN TIME ON _____, 2011.</u> IN ORDER TO BE COUNTED, BALLOTS MUST BE FILED WITH THE BANKRUPTCY COURT ON OR BEFORE THAT TIME.

IT IS OF THE UTMOST IMPORTANCE TO THE DEBTORS THAT YOU VOTE PROMPTLY TO ACCEPT THE PLAN.

(iii) **Incomplete or Irregular Ballots**. Ballots which fail to designate the Class to which they apply shall be counted, subject only to contrary determinations by the Bankruptcy Court, in the Class determined by the Debtors. **BALLOTS THAT ARE NOT SIGNED AND BALLOTS THAT ARE SIGNED BUT NOT EXPRESSLY VOTED EITHER FOR ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.**

## D. <u>Confirmation</u>.

(1) <u>Confirmation Requirements</u>. For a debtor's plan to be confirmed, Chapter 11 requires that a requisite number of votes be cast in favor of the plan. However, Chapter 11 does not require that every holder of a claim or equity interest vote in favor of the plan for it to be confirmed by the Bankruptcy Court. For any class of impaired claims to accept the plan, Section 1126(c) of the Bankruptcy Code requires that claimants who hold a majority in number and at least two-thirds (2/3) in the amount of the allowed claims in such class that actually vote on the plan must vote to accept the plan. For a class of impaired equity interests to accept the plan, Section 1126(d) of the Bankruptcy Code requires that holders of at least two-thirds (2/3) in amount of the allowed equity interests in such class that actually vote on the plan must vote to accept the plan.

Even if all classes of claims and equity interests accept a plan, Section 1129 of the Bankruptcy Code requires that the Bankruptcy Court find, among other things, that the plan is in the best interests of holders of claims and equity interests. Section 1129 generally requires that the value to be distributed to holders of claims and equity interests may not be less than such parties would receive if the debtor were to be liquidated under Chapter 7 of the Bankruptcy Code.

(2) <u>Cramdown</u>. Pursuant to Section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm a plan even though less than all of the classes of claims and equity interests accept it. Confirmation of a plan over the objection of one or more impaired classes of claims or equity interests is generally referred to as a "cramdown." For a plan to be confirmed over the objection of an impaired class of claims or equity interests, the debtor must show that the plan does not discriminate unfairly and is fair and equitable with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class of Claims fails to accept the Plan by the requisite majority, the Debtors reserve the right to request that the Bankruptcy Court confirm the Plan in accordance with Section 1129(b) of the Bankruptcy Code, on the basis that the Plan is fair and equitable, does not discriminate unfairly with respect to any non-accepting Impaired Class and provides to the Holders of Claims in each Impaired Class property of a value, as of the Effective Date, equal to the Allowed Amount of such Claims, or that any Holder of a Claim or Equity Interest that is junior to such Claims shall not receive or retain any property on account of such junior Claim or Equity Interest.

(3)     Confirmation Hearing.  The Bankruptcy Court has set a Confirmation Hearing with respect to the Plan.  Each party-in-interest will receive, either with this Disclosure Statement or separately, the Bankruptcy Court's notice of the hearing on Confirmation of the Plan.  The Confirmation Hearing may be adjourned, from time to time, by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing or any adjournment thereof.

(4)     Feasibility of the Plan.  The terms proposed by the Debtors for the treatment of Allowed Claims and Allowed Equity Interests under the Plan are based upon, among other things, the assessment by the Debtors of the relative priority afforded to various Claims and Equity Interests under the Bankruptcy Code and the Debtors' ability to repay each of the obligations consistent with the capital requirements of the Reorganized Debtors' business. **WHILE THERE CAN BE NO ASSURANCE THAT THE PLAN, IF CONFIRMED, WILL BE SUCCESSFUL, THE DEBTORS BELIEVE THAT REORGANIZATION UNDER THE PLAN PROVIDES FOR THE GREATEST AND EARLIEST RECOVERIES FOR ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS.**

(5)     Effect of Confirmation.  Confirmation makes the Plan binding upon the Debtors, all Holders of Claims and Equity Interests, and other parties-in-interest, regardless of whether or not it has been accepted by them.

**E.     Procedure for Filing Proofs of Claim and Proofs of Equity Interest**.

(1)     Bar Dates.

(i)     **General Bar Date for Claims**.  The deadline for Proofs of Claim to have been filed in the Seaview case was April 12, 2011 and in the Gulf and Harbor cases was September 21, 2011 (together, the "General Claims Bar Dates").  **IF A CLAIM WAS LISTED IN THE SCHEDULES FILED BY THE DEBTORS AND NOT DESIGNATED AS EITHER (1) CONTINGENT, (2) UNLIQUIDATED, (3) DISPUTED, OR (4) OF AN AMOUNT OF "$0.00," "_____," OR "UNKNOWN," A PROOF OF CLAIM NEED NOT HAVE BEEN FILED.**  Both the Schedules and the registers listing Proofs of Claim that were filed on or before the applicable General Claims Bar Dates are on file at the Bankruptcy Court and are open for inspection during regular Bankruptcy Court hours.

(ii)     **Administrative Claims Bar Date**.  Unless otherwise ordered by the Bankruptcy Court, the Disclosure Statement Order will establish a bar date or deadline for the filing of all Applications for Allowance of Administrative Expense ("Administrative Claims

Bar Date"). Administrative Expense Claims arising after the Administrative Claims Bar Date shall be filed within thirty (30) days of the date of entry of an Order confirming the Plan (the "Confirmation Order").

        (iii)    **Administrative Expense Claims**. Unless otherwise ordered by the Bankruptcy Court, the notice of Confirmation to be delivered pursuant to Bankruptcy Rules 2002(f) and 3020(c) will set forth such date and constitute notice of the Administrative Claims Bar Date. The Reorganized Debtors and any other party-in-interest will have approximately thirty (30) days after the Administrative Claims Bar Date to review and object to such Administrative Expense Claims before a hearing for determination of such Claims is held by the Bankruptcy Court.

        (2)    Executory Contracts. Unless otherwise ordered by the Bankruptcy Court, parties to Executory Contracts that are rejected by the Debtors under the Plan must file any Claims for damages resulting from such rejection within thirty (30) calendar days after the Confirmation Date. Parties to Executory Contracts that were or may be rejected by the Debtors by motion or otherwise before Confirmation must file Proofs of Claim for any rejection damages in accordance with the Bankruptcy Court's Order with respect to such rejection.

## IV.    INFORMATION REGARDING THE DEBTOR

### A.    Overview and History of the Debtors.

Debtors Seaview, Gulf, and Harbor are owned by J&M Development Concepts LLC (the "Parent Company"). Joseph "Joe" Borda, the President of each of the Debtors, has over 45 years of experience as a successful engineer, architect, and developer. For roughly 25 of those years, Mr. Borda has worked in Pasco County, Florida, successfully developing and selling real property.

The Debtors' Properties are primarily located in an area just south of New Port Richey, Florida. The Debtors' Properties are unique to that area, and include a luxurious condominium complex, a private boat dock with 45 slips, garages, and undeveloped land that enjoys valuable rights and entitlements for future development of multi-family and single-family residential units, together with water access.

Specifically, Seaview developed, built, owns, and now manages a nine-story, waterfront high-rise condominium (the "Seaview Building") in Pasco County, Florida, commonly known as "Seaview Place." Approximately 31 of the units in the Seaview Building are currently occupied by residents, with Seaview leasing approximately five of those units to tenants. Seaview is currently in the business of selling and renting the Condo Units and otherwise operating the Seaview Project.

The Seaview Building was constructed between 2007-2008 and funded in large part by a construction loan in the original amount of approximately $22,000,000 from Colonial Bank, N.A. ("Colonial"). The outstanding balance on the loan (the "Seaview Loan") is approximately $14,770,144. According to an appraisal commissioned by Branch Banking and Trust Company

("BB&T")[1] in 2010, the estimated "discounted sellout ('bulk sale')" value of Seaview's interest in 126 Condo Units, garages, and 45 boat slips is $24,750,000. According to BB&T's appraisal, the aggregate retail value of Seaview's interest is $35,860,000.

Gulf, formed in 1985, owns the following properties in Pasco and Pinellas Counties:

- Tract 40-A ("Tract 40-A") and Tract 40-B ("Tract 40-B"), which are apparently encumbered by mortgages in favor of BB&T securing loans totaling approximately $6,640,000 (together, the "Gulf Loan"). These properties are adjacent to Seaview Place and have valuable entitlements and vesting, which enables the land to be developed for multi-family and single-family residential units. Tract 40-B also includes a dock with 42 boat slips. According to an appraisal commissioned by BB&T in 2010, the estimated total market value (bulk or discounted) of the fee simple interest in these properties as of March 25, 2011 is $6,750,000 (with $1,080,000 of value attributed to Tract 40-A and $5,670,000 attributed to Tract 40-B).

- A single-family lot located at 470 Poinsettia in Belleair, Florida ("Belleair"), which is encumbered by a mortgage held by BB&T securing a loan with an estimated balance of $280,550.63. Gulf estimates the value of the property to be $365,000.00.

- Tract Comm 3 is vacant land zoned for Commercial 3 development. Gulf values the property at $210,000. This parcel is encumbered by a mortgage that was originated with Cortez Community Bank ("Cortez"), which is now allegedly held by Premier American Bank ("Premier")[2] and secures a loan having a balance of roughly $138,590.73. Tract Comm 3 appears to serve as additional Collateral for another loan that Cortez made to Debtors' Affiliate, Dockside at Gulf Landings, Inc. ("Dockside"), which apparently has an estimated balance of $295,919.37 (the "Dockside Loan"). The primary Collateral for the Dockside Loan is land and a dock facility with 21 unsold wet slips, which is valued at approximately $305,000 (the "Dockside Property"). Based on these values, the various loans that are now apparently held by Premier, in the total amount of $434,510.10, appear to be secured by property with a total estimated value of $515,000.

- Govt. Lot 1 is a small unencumbered lot that Gulf believes has inconsequential value as evidenced by the tax assessor's appraised value of $694.

Harbor was formed in 2005 and owns Real Property known as Tract 50-C in Pasco County ("Tract 50-C"). This parcel of Real Property is valued at $1,085,000, and appears to be additional Collateral for the Gulf Loan and Seaview Loan, pursuant to the Cross Default/Cross

---

[1] The Colonial loans were apparently assigned to or acquired by BB&T from the FDIC but the Debtors have not independently verified the nature or extent of that alleged assignment.

[2] Premier seems to have acquired this loan and mortgage from the FDIC when Cortez recently failed but, again, the Debtors have not independently verified the nature and extent of Premier's alleged acquisition of Cortez's loan(s).

Collateralization Agreement (the "Cross Collateralization Agreement") between Seaview, Gulf, Harbor, and BB&T executed in 2009.

The Cross Collateralization Agreement provides that all of Seaview's Property would serve as additional Collateral for the Gulf Loan, certain of Gulf's Property (Tract 40-A and Tract 40-B) would serve as additional Collateral for the Seaview Loan, and all of Harbor's Property would serve as additional Collateral for both the Seaview Loan and the Gulf Loan. It is unclear what, if any, consideration was provided to the respective Debtors in connection with the Cross Collateralization Agreement. In addition to the Cross Collateralization Agreement, it appears Colonial also obtained guarantees from the Debtors, the Parent Company, and from Mr. Borda and Marlene Borda as well (together, the "Principals").

Essentially, BB&T has cumulative Claims against the Debtors totaling about $21,690,694[3] (collectively, the "Colonial Loans"), which appear to be secured by certain of the Debtors' Real Property having an estimated total value of around $30,000,000.[4]

Historically, the operating and maintenance expenses necessary for the Seaview Project (the "O&M Expenses"), as well as a portion of debt service on the BB&T Loans, was paid from a considerable expense reserve account created in connection with certain amendments made in November 2009 to the Seaview Loan (the "Reserve Account"). As developers, the Debtors have not yet turned over control of the respective condominium and homeowners' associations in connection with their Real Property. As such, the Debtors have obligations related to operating the Seaview Project including, without limitation, obligations arising under Chapters 718 and 720 of the Florida Statutes to pay certain O&M Expenses and under the *Declaration of Condominium for Seaview Place at Gulf Landings, a Condominium*, (recorded in Official Records Book 7768, Page 783 of the Public Records of Pasco County, Florida, as amended from time to time, a copy of which is attached as **Exhibit "B."** At various times (most recently in early 2011), BB&T refused to allow the Reserve Account to be used to pay the O&M Expenses. As a result, the Principals, through J&M Financial Investments, LLC and other means, were forced to provide more than $4,000,000 to pay operating expenses, interest on the loans, and boat docks on behalf of the Debtors.

Interestingly, Seaview had never been declared in default under the Colonial Loans until after BB&T acquired them in mid-2009. It was only after BB&T acquired the Colonial Loans that the disputes arose between Seaview and BB&T. Specifically, those disputes involved disagreements among the parties relating to BB&T's obligations to provide (1) "end-loans" to potential buyers of Seaview condominiums ("End Loans"), and (2) certain reductions to the "release prices" for the Seaview condominiums in light of the current market conditions ("Release Price Modifications"). Seaview believes those accommodations are contemplated by agreements and understandings underlying the Colonial Loans and attempted for months to negotiate a consensual resolution to those disputes. Nevertheless, BB&T refused to abide by its

---

[3] This amount includes the Belleair loan; however, Belleair appears to be excluded from the Cross Collateralization Agreement.
[4] The values provided herein are based on pre-petition appraisals and estimates and certain valuation standards. The Liquidation Analysis attached as **Exhibit "C,"** as more thoroughly discussed in Section XII.B reflects recent values obtained by the Debtors in connection with Confirmation and more conservative valuation standards based on the Debtors' review of recent case law on "dirt for debt" plans.

commitment and the historic practice of providing reasonable accommodations regarding the End Loans and Release Price Modifications, making it virtually impossible for Seaview to sell the Condo Units.

Seaview's disputes with BB&T came to a head in connection with negotiations for the renewal and extension of the Colonial Loans toward the end of 2010. Exacerbating the situation was BB&T's unilateral election to apply most, if not all, of the funds remaining in the Reserve Account to pay a portion of the Seaview Loan, rather than using it to fund the recurring monthly O&M Expenses. Accordingly, Seaview filed for protection under Chapter 11 of the Bankruptcy Code on March 22, 2011.

Because of issues with BB&T and apparent cross-collateralization of the various loans, the Debtors have been unable to continue to fund the debt service for their loans to BB&T. Accordingly, on or about April 8, 2011, BB&T filed a *Complaint for Foreclosure and Damages* against Gulf, Harbor, the Parent Company, the Principals, and other related entities in the Sixth Judicial Circuit in and for Pinellas County (Case No. 512011CA1582WS), and on March 30, 2011, BB&T filed a separate *Complaint for Foreclosure and Damages* against Gulf and the Principals in the Sixth Judicial Circuit in and for Pinellas County (Case No. 11002758CI) (together, the "State Litigation"). Following Seaview's bankruptcy filing, the Debtors have attempted to reach a consensual resolution of the disputes with BB&T. After months of negotiations, and despite some progress, a final global resolution of the disputes among the Debtors and BB&T was not initially forthcoming. As such, Gulf and Harbor followed Seaview's lead and commenced their own Reorganization Cases. Specifically, on July 8, 2011, Gulf and Harbor filed for protection under Chapter 11 of the Bankruptcy Code.

## B.    Significant Events in the Reorganization Cases.

(1)    Seaview's Filing.

Since March 22, 2011, Seaview has operated its business and managed its assets as a debtor-in-possession under Sections 1107 and 1108 of the Bankruptcy Code. To ensure the continuation of normal business operations and preserve the value of the business, the Bankruptcy Court authorized Seaview to continue its business activities.

Seaview filed several papers with the Bankruptcy Court seeking relief through what are often termed "first day motions." First day motions are generally intended to ease and facilitate the transition between a debtor's pre-petition and post-petition business operations. These motions are essentially designed to allow certain normal business practices and provide for smoother administration of the bankruptcy case but require the prior approval of the Bankruptcy Court. The first day motions filed and Orders obtained in the Reorganization Cases were typical of orders entered in business reorganization cases in this jurisdiction, and requested and authorized, among other things:

- use of property that may be "Cash Collateral";
- authorization to retain Jennis & Bowen, P.L. as counsel;
- authorization to obtain post-petition financing;

- authorization to pay pre-petition wages; and
- resolution of utility deposit issues.

The DIP Financing has been critical to Seaview's ability to fund its obligations in connection with operating the Seaview Building since the Petition Date. More recently, the Debtors retained the valuation services of Ron Oxtal in connection with their disputes with BB&T and Confirmation of their original Plan.

       (2)      <u>Gulf and Harbor's Filing</u>.

Since July 8, 2011, Gulf and Harbor have been managing their assets as debtors-in-possession. Because Gulf and Harbor do not have employees or utilities in either of their names, the only first day motion filed on their behalf other than the application to employ their bankruptcy counsel was a motion for joint administration of the Reorganization Cases with the Seaview bankruptcy case as the lead case.

On July 12, 2011, Premier filed *Premier American Bank's Verified Motion for Termination or Modification of Automatic Stay* (Doc. No. 12) ("<u>Premier's Stay Motion</u>") in the Gulf case in order to proceed against the Tract Comm 3 property. As mentioned in more detail below, Gulf expects to imminently reach a consensual resolution in connection with Premier's Stay Motion.

       (3)      <u>Recent Settlements</u>.

At the request of the Debtors and BB&T, on September 23, 2011, the Bankruptcy Court entered its *Order Directing Debtors and BB&T to Mediation* (Doc. No. 152). On September 29, 2011, the Debtors (and certain of their Affiliates) and BB&T participated in that Court-ordered mediation. As a result, the Debtors and BB&T agreed to a settlement that paves the way for the consensual Confirmation of the amended Plan, as is evidenced by the *Mediation Settlement Agreement* (Doc. No. 154) (the "<u>Mediation Agreement</u>"). Additionally, as mentioned above, Gulf has successfully concluded negotiations with Premier, and believes that a joint motion to approve the settlement between Gulf and Premier will be filed shortly after this amended Disclosure Statement. The Debtors expect the terms of that settlement shall be integrated into and effectuated by the Plan. The Debtors further believe settlement with Premier also increases the likelihood of a consensual Confirmation.

## V.      **MEANS FOR EXECUTION OF PLAN**

### A.    **Plan Funding**

The Debtors' continuing operations and payments to be made under the Plan will be funded by (1) any available Cash, (2) revenues generated from future sales of the Debtors' Retained Property, (3) through the surrender of a substantial portion of their Property in an amount determined by the Bankruptcy Court or by agreement among the affected Creditors, sufficient to satisfy all Allowed Secured Claims, and/or (4) through Exit Financing.

## B.    Substantive Consolidation

Substantive consolidation is an equitable remedy that the Bankruptcy Court may order. In general, substantive consolidation can affect creditor recovery because it pools the assets and liabilities of entities with different debt-to-asset ratios.  The Debtors believe that limited substantive consolidation as contemplated in the Plan may be in the best interest of all Holders of Claims and Equity Interests and reserve the right to seek such relief.

Relevant issues the Debtors have considered in pursuing limited substantive consolidation are the following: (a) whether the elements necessary to obtain an Order of substantive consolidation are satisfied in the Reorganization Cases; (b) the value of the Debtors' Estates on an individual and a consolidated basis, and the proper method of determining such value; (c) whether the Estate of each Debtor should be treated separately for purposes of making payments to holders of Claims; (d) whether it is possible to attribute particular Claims asserted in the Reorganization Cases to a specific Debtor; (e) the value to be accorded to loans and/or other Claims of one Debtor in favor of another Debtor; (f) the strength of the relative rights and positions of the different Classes of Unsecured Claims with respect to disputes over substantive consolidation; and (g) the amount and priority of Intercompany Claims and the potential voidability of certain intercompany transfers including, but not limited to, the cross-collateralization of certain of Debtors' Properties to secure BB&T loans and intercompany guaranties.

The Intercompany Claims include Debtors' indemnifications claims against each other based on the cross collateralization and cross guarantees included in the Cross Collateralization Agreement.  Additionally, the Debtors may have fraudulent transfer claims against each other based on the Cross Collateralization Agreement.  To sort these Intercompany Claims would result in unnecessary litigation and expenses to the Estates, especially when substantive consolidation would address these issues.

Substantive consolidation may be best for Creditors too.  Based on an analysis of the liquidation of the Property of each of the Debtors in a hypothetical Chapter 7 liquidation in which a court-appointed trustee liquidates the companies' assets pursuant to an orderly liquidation, it would appear that under separate Chapter 7 cases, the Debtors' Property may be insufficient in their individual cases to satisfy all of the Claims of the Unsecured Creditors.  See the Liquidation Analysis attached as **Exhibit "C."**  Coupled with the compromises of the disputes with BB&T and other Creditors embodied in the Plan, substantive consolidation of these Debtors' Properties would provide the Debtors the opportunity to pay the Unsecured Creditors in full in all three cases.  For a more thorough discussion of the Liquidation Analysis, see Section XII.B. below.

The substantive consolidation of the Debtors' Estates pursuant to the Plan shall, in and of itself, not result in the merger or otherwise affect the separate legal existence of each Debtor. The consolidation shall not (a) impair the validity or enforceability with respect to assumed Executory Contracts; (b) affect valid, enforceable, and unavoidable Liens that would not otherwise be terminated under the Plan, except for Liens that secure a Claim that is eliminated by virtue of the Plan and Liens against Collateral that are extinguished by virtue of the Plan; (c) have the effect of creating a Claim in a Class different from the Class in which a Claim would

have been placed in the absence of substantive consolidation; or (d) affect the obligation of each of the Reorganized Debtors, pursuant to Section 1930 of Title 28 of the United States Code, to pay quarterly fees to the Office of the United States Trustee through the Effective Date.

## VI.    CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN

Under the Plan, the Debtors have established the various Classes of Creditors and Equity Interest Holders pursuant to Section 1122 of the Bankruptcy Code. The Plan places the various Claims and Equity Interests in a particular Class only if such Claim or Equity Interest is substantially similar to the other Claims or Equity Interests in such Class or the treatment of such Claims or Equity Interests is substantially similar. Pursuant to the Bankruptcy Code, the Debtors have not classified Administrative Expense Claims and Priority Tax Claims under the Plan. Holders of other Claims and Equity Interests are classified in the Plan as follows:

| Class | Description | Status | Entitled to Vote |
|---|---|---|---|
| Class 1 | Priority Claims | Unimpaired | No |
| Class 2A | Secured Tax Claims of Mike Olson, Pasco County Tax Collector | Unimpaired | No |
| Class 2B | Secured Tax Claims of Betty Gramley, Pinellas County Tax Collector | Unimpaired | No |
| Class 3A | Secured Claims of BB&T | Impaired | Yes |
| Class 3B | Secured Claims of Premier | Impaired | Yes |
| Class 4A | Secured Claim of Gulf Contractors | Impaired | Yes |
| Class 4B | Secured Claim of Innovative Electrical Contractors | Impaired | Yes |
| Class 4C | Secured Claim of Parties in Possession | Impaired | Yes |
| Class 4D | All Other Secured Claims | Impaired | Yes |
| Class 5 | General Unsecured Claims | Impaired | Yes |
| Class 6 | Small Claims | Impaired | Yes |
| Class 7 | Equity Interests | Impaired | No |

The Debtors believe these classifications do not discriminate unfairly, Claims in each Class are substantially similar to each other, separate classifications are based on the nature of the respective Claims and Equity Interests, and the classifications are justified under the

Bankruptcy Code and applicable law. The table below summarizes the treatment of the Claims and Equity Interests under the Plan.

Any estimated Claim amounts are calculated as of the date of this Disclosure Statement. For certain unclassified Claims, as well as Classes of Claims, the actual amounts of Allowed Claims could materially exceed or could be materially less than the estimated amounts shown in the table that follows. The Debtors have not yet fully analyzed all Proofs of Claim filed in the Reorganization Cases to determine whether the amounts stated in such Proofs of Claim are accurate. The estimated Claim amounts set forth below are consolidated amounts based upon the Debtors' review of its books and records and of certain Proofs of Claim, and may include estimates of a number of Claims that are Contingent, Disputed, and/or unliquidated.

| Claim/Class Description | Summary of Treatment Under Plan |
|---|---|
| Administrative Expense Claims<br><br>(Estimated at approximately $60,000) | Allowed Administrative Claimants (including Professional Expense Claimants), other than the Holders of any DIP Financing Claim (which shall be treated as described below), shall receive the Allowed Amount of such Holder's Claim in Cash in full satisfaction, settlement, release, extinguishment, and discharge of such Claim, on the Effective Date. As a condition of the Effective Date occurring, these Distributions shall be funded from available Cash or Exit Financing that shall be obtained in conjunction with Confirmation in an amount sufficient to fund such Allowed Claims in full. The Holders of such Allowed Claims and the Debtors may agree to some mutually acceptable alternative treatment; provided, however, that Allowed Administrative Claims representing post-petition liabilities incurred in the ordinary course of business by the Debtors shall be paid by the Reorganized Debtors in accordance with the terms and conditions of the particular transactions relating to such liabilities and any agreements relating thereto. |
| DIP Financing Claims<br><br>(Estimated at $300,000) | Allowed DIP Financing Claimants shall, at the election of such Holder, (a) be paid the full amount of the DIP Financing Claim in Cash, on the Effective Date subject to the terms and conditions set forth in the documents evidencing the terms of the DIP Financing Claim, or (b) shall accept in full satisfaction of the DIP Financing one hundred percent (100%) of the shares of new stock in the Reorganized Debtors to be issued under the Plan on the Effective Date, upon which election all existing Equity Interests in the Debtors shall be cancelled and extinguished, or (c) as otherwise agreed by the Holder(s) of the DIP Financing Claim and the Debtors (or Reorganized Debtors, as applicable). |
| Priority Tax Claims<br><br>(Estimated at $0) | Allowed Priority Tax Claimants (except any such Holder that agrees to different treatment) shall receive the amount of such Holder's Allowed Priority Tax Claim, without post-petition interest or penalty (a) in Cash, in full satisfaction, settlement, release, extinguishment, and discharge of such Claim, on the Effective Date, or (b) in regular Cash installment payments over a period not exceeding five (5) years from the Petition Date in accordance with Section 1129(a)(9)(C)(ii) of the Bankruptcy Code, or upon such other terms as may be agreed upon by the Holder of the Claim. Any Priority Tax Claims due and owing as of the Effective Date that arose out of or relate to Property of the Debtors shall be paid as set forth above solely by the Person who owns that Property immediately following the Effective Date. |

| Claim/Class Description | Summary of Treatment Under Plan |
|---|---|
| Class 1 – Priority Claims (Estimated at $0)[5] | Allowed Priority Claimants shall receive (1) the Allowed Amount of such Holder's Allowed Priority Claim, in Cash, on the Effective Date, (2) payment as otherwise permitted by the Bankruptcy Code or by a Final Order of the Bankruptcy Court, or (3) such other less favorable treatment as may be agreed to in writing by such Holder and the Debtors<br><br>Priority Claims are Unimpaired. The Holders of such Claims are not entitled to vote on the Plan. |
| Class 2A - Secured Tax Claims of Pasco County (Estimated at $450,000) | Allowed Class 2A Claimants shall retain all Liens encumbering any Property to the extent such Property is subject to the Liens of such Class 2A Creditors pursuant to applicable non-bankruptcy law as of the Effective Date (regardless of whether such Property is retained by the Reorganized Debtors or transferred to another Entity pursuant to this Plan). Such Allowed Class 2A Claims shall be paid by the party to whom the Property subject to such tax Lien is transferred on the Effective Date (or the respective Reorganized Debtor to the extent the Property is retained by such Reorganized Debtor) in accordance with Section 1129(a)(9)(C) and (D). The Debtors (on behalf of themselves and any recipient of transferred Property under this Plan) reserve all rights to pursue any available challenges to any valuation or assessment available under law upon receipt of the actual T.R.I.M. notice for 2011 taxes.<br><br>Class 2A is Unimpaired under the Plan. The Holders of such Claims are not entitled to vote on the Plan. |
| Class 2B - Secured Tax Claims of Pinellas County (Estimated at $4,550) | Allowed Class 2B Claimants shall retain all Liens encumbering any Property to the extent such Property is subject to the Liens of such Class 2B Creditors pursuant to applicable non-bankruptcy law as of the Effective Date (regardless of whether such Property is retained by the Reorganized Debtors or transferred to another Entity pursuant to this Plan). Such Allowed Class 2B Claims shall be paid by the party to whom the Property subject to such tax Lien is transferred on the Effective Date (or the respective Reorganized Debtor to the extent the Property is retained by such Reorganized Debtor) in accordance with Section 1129(a)(9)(C) and (D). The Debtors (on behalf of themselves and any recipient of transferred Property under this Plan) reserve all rights to pursue any available challenges to any valuation or assessment available under law upon receipt of the actual T.R.I.M. notice for 2011 taxes.<br><br>Class 2B is Unimpaired under the Plan. The Holders of such Claims are not entitled to vote on the Plan. |
| Class 3A – Secured Claim of BB&T (Estimated at $21,690,694) | In accordance with the Mediation Agreement, on the Effective Date, Seaview and Gulf shall transfer, assign, and convey to BB&T all of their respective right, title, and ownership in the Seaview Place Condominiums consisting of 121 condominium units, 53 garages, and 45 boat slips, Tract 40-A, and Tract 40-B, along with any corresponding Developer Rights and all entitlements related to the BB&T Transferred Property in full and complete satisfaction of BB&T's Claims against any and all of the Debtors and the Debtors' Affiliates released under the Mediation Agreement; BB&T shall continue and ultimately dismiss with prejudice the State Litigation as to all parties; the Debtors, BB&T, the Principals, and J&M Development Concepts LLC, shall execute mutual general releases; and as long as Debtors are in compliance with the |

---

[5] The Debtors believe that the nearly $375,000 Claim of Best Suncoast for unpaid commission would more properly be classified as a General Unsecured Claim.

| Claim/Class Description | Summary of Treatment Under Plan |
|---|---|
| | terms of the Mediation Agreement, BB&T will not assert an Unsecured Claim against the Debtors and will vote in favor of and support Confirmation of the Plan. |
| | Class 3A is Impaired under the Plan and the Holder of the Class 3A Claim is entitled to vote to accept or reject the Plan. |
| Class 3B – Secured Claims of Premier (Estimated at $434,510) | Pursuant to the Premier Settlement and in full satisfaction the Allowed Secured Class 3B Claims, no later than twenty (20) days after the Effective Date, Gulf, Dockside, and Premier shall revise the Loan Documents to reflect the terms of the Premier Settlement, the Reorganized Debtors will cure all interest arrearages, and the Reorganized Debtors and Dockside shall make interest-only payments on the Obligations. Further, the parties have agreed to a maturity date that is twenty-four (24) months following the first payment date following the Effective Date (the "Maturity Date"), which may be extended upon Dockside and the Reorganized Debtors' reduction of the outstanding principal to a certain amount; Premier has agreed to a release price for the Dockside docks; the Obligations may be prepaid without penalty; Reorganized Debtors shall pay all taxes related to the Premier Collateral subject to certain exemptions; in the event of a default, Reorganized Debtors stipulate to the entry of a judgment *in rem* solely against the Premier Collateral in the pending State Court Action, which shall be abated and administratively closed; Premier's cure of certain negative reference(s) to certain credit reporting agencies; and Premier has agreed not object to or vote to reject the Plan as long as it incorporates the terms of the Premier Settlement.

To the extent the Premier Settlement is not effectuated, the Debtors reserve the right to amend the treatment of Allowed Secured Class 3B Claims to reflect the treatment previously provided for such claims in *Joint Plan of Reorganization of Seaview Place Developers, Inc., Gulf Landings Development Corporation, and Harbor Colony Development, Inc.* (Doc. No. 88)

Class 3B is Impaired under the Plan and the Holder of the Class 3B Claim is entitled to vote to accept or reject the Plan. |
| Class 4 – Other Secured Claims (4A, 4B, 4C, 4D) (Estimated at $0) | In the past, the Debtors have had Claims of certain parties asserted as Secured Claims, particularly in connection with construction of the Seaview Building. While the Debtors believe no such valid Secured Claims exist any longer, they have included Class 4 with subclasses 4A, 4B, 4C, and 4D, in an abundance of caution. As such, Claims of such Class 4 Claimants, if any, at the election of the Debtors and with Bankruptcy Court approval, (a) shall be paid from any available surety bond or similar alternative collateral in due course upon the earlier of the Effective Date or the date any Class 4 Claim becomes an Allowed Claim, (b) shall be paid in full, in Cash, on the Effective Date, (c) shall receive the "indubitable equivalent" of its Allowed Secured Claim through the surrender of any Collateral securing such Claim, (d) shall receive Cash over five years in the full amount of its Allowed Secured Claim and retain any Liens until such Allowed Secured Claim is fully paid or (e) shall receive a different treatment as may be otherwise agreed upon by such Holder and the Debtors and approved by the Bankruptcy Court. If a Class 4 Claim is not Allowed as a Secured Claim as of the Confirmation Date, then the entry of a Confirmation Order shall constitute a final determination that the value of the Collateral securing the Class 4 Claim is less than the amount of senior Liens on such Property and that any such Lien is Avoided through the Confirmation |

| Claim/Class Description | Summary of Treatment Under Plan |
|---|---|
| | Order, and any Allowed portion of such Claim shall be treated as a Class 5 Unsecured Claim.<br><br>Either prior to or at Confirmation, the Debtors may seek a determination from the Bankruptcy Court of (1) the Allowed Amount of the Secured Claim of any Holder of a Class 4 Claim pursuant to Section 506(a) of the Bankruptcy Code, (2) the value of any Property securing any such Allowed Class 4 Claim, and/or (3) the entry of an Estimation Order establishing the Estimated Amount of such Class 4 Claim.<br><br>Class 4 is Impaired under the Plan and the Holder(s) of a Class 4 Claim are entitled to vote to accept or reject the Plan. |
| Class 5 - General Unsecured Claims<br><br>(Estimated at $257,500)[7] | Allowed Class 5 Claims shall receive (a) either (Option 1) a Pro Rata Share of Cash available in the Sales Proceeds Pool (which Pro Rata Share shall be calculated based on the then Allowed Class 5 Claims, including reserves for any Disputed Claims) as of each Distribution Date, which Distributions shall, to the extent of funding in the Sales Proceeds Pool, commence on the first anniversary date following the Effective Date and thereafter on each consecutive anniversary date following the Effective Date (plus interest at an annual rate of four percent (4%)), until such Claims are fully paid, or (Option 2) alternatively, at the election of the Debtors and the Holder of such Claim, a lump sum payment of Cash equal to seventy-five percent (75%) of the Allowed Amount of such Class 5 Claim (without interest) within forty-five (45) days following the Effective Date, in full and complete satisfaction of such Claim. Alternatively, the Holders of Allowed Class 5 Claims may receive a less favorable treatment as otherwise agreed to by the parties and approved by the Bankruptcy Court. Class 5 Creditors electing Option 2 described herein shall do so by indicating that election on their respective Ballots which, if such election is accepted by the Debtors, shall be conclusively deemed for all purposes to be an affirmative vote accepting the Plan.<br><br>Class 5 is Impaired under the Plan and the Holder(s) of Class 5 Claims are entitled to vote to accept or reject the Plan. |
| Class 6 - Small Claims<br><br>(Estimated at $2,000) | Allowed Small Claims shall receive, within forty-five (45) days following the Effective Date, the lesser of (1) one hundred percent (100%) of the Allowed Amount of such Holder's Claim (without interest), or (2) two hundred fifty dollars ($250.00) in Cash and in full satisfaction of such Holder's Allowed Claim.<br><br>Class 6 is Impaired under the Plan and the Holder(s) of any Class 6 Claim is entitled to vote to accept or reject the Plan. |
| Class 7 - Equity Interests | Unless all Equity Interests are cancelled and extinguished (i) in order to satisfy the requirements of 11 U.S.C. § 1129(b)(2)(B) or (ii) because the DIP Lender has elected to accept newly issued stock in the Reorganized Debtor(s), in full or partial satisfaction of its DIP Financing Claim then, on the Effective Date, each Holder of an Equity Interest in Class 7 shall retain such Equity Interest and shall retain, unaltered, the legal, equitable, and contractual rights to which |

[7] This estimate excludes the Association Claims because, if valid, they shall be deemed fully satisfied by Seaview's payment in the ordinary course of its obligations under the relevant declaration for all actual common operating expenses incurred through the Effective Date, via its continuing use of the DIP Financing for those purposes.

| Claim/Class Description | Summary of Treatment Under Plan |
|---|---|
| | such Equity Interest entitles such Holder.<br><br>Class 7 is Impaired under the Plan and the Holder(s) of a Class 7 Equity Interest is not entitled to vote to accept or reject the Plan. |

## VII.   CLAIMS ALLOWANCE AND PAYMENT, EXECUTORY CONTRACTS, REVESTING OF ASSETS

### A.   Allowed Claims, Distribution Rights, and Objections to Claims.

#### (1)   Allowance Requirement

Only Holders of Allowed Claims are entitled to receive Distributions under the Plan. An Allowed Administrative Expense Claim is all or any portion of an Administrative Expense Claim (a) that has been Allowed, or adjudicated in favor of the Holder by estimation or liquidation, by a Final Order, or (b) that was incurred by the Debtors in the ordinary course of business during the Reorganization Cases. A post-petition obligation that is Contingent or Disputed and subject to liquidation through pending or prospective litigation including, but not limited to, alleged obligations arising from personal injury, property damage, products liability, consumer complaints, employment law (excluding Claims arising under workers' compensation law), secondary payor liability, or any other Disputed legal or equitable Claim based on tort, statute, contract, equity, or common law, is not considered to be an obligation that is payable in the ordinary course of business.

An Allowed Claim (other than an Administrative Expense Claim) is such Claim or any portion thereof (a) that has been Allowed, or adjudicated in favor of the Holder by estimation or liquidation, by a Final Order, or (b) as to which (i) no Proof of Claim has been filed with the Bankruptcy Court, and (ii) the liquidated and non-Contingent amount of which is included in the Schedules, other than a Claim that is included in the Schedules at zero, in an unknown amount, or as Disputed, or (c) for which a Proof of Claim in a liquidated amount has been timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, any Final Order of the Bankruptcy Court, or other applicable bankruptcy law, and as to which either (i) no objection to its allowance has been filed within the periods of limitation fixed by the Plan, the Bankruptcy Code, or any Order of the Bankruptcy Court, or (ii) any objection to its allowance has been settled, withdrawn, or denied by a Final Order, or (d) that is expressly allowed in a liquidated amount in the Plan.

In no event will those Administrative Expense Claims or those other Claims subject to disallowance under Section 502(d) of the Bankruptcy Code be deemed to be Allowed Claims.

#### (2)   Interest on Claims; Dividends; Attorneys' Fees

The Plan provides that unless otherwise specifically provided for in the Plan or the Confirmation Order, post-petition interest, costs, and attorneys' fees will not accrue or be paid on Claims, and no Holder of a Claim will be entitled to interest, costs, or attorneys' fees accruing on or after the Petition Date on any Claim or Equity Interest.

(3)    Making of Distributions

The Reorganized Debtors shall, following the Effective Date, be responsible for making (or causing to be made) Distributions under the Plan.  Unless otherwise ordered by the Court, Distributions to Holders of Allowed Claims will be made by the Reorganized Debtors (a) at the addresses set forth on the Proofs of Claim filed by such Holders, (b) at the addresses reflected in the Schedules if no Proof of Claim has been filed, or (c) at the addresses set forth in any written notices of address change delivered to the Debtors or the Reorganized Debtors after the date of any related Proof of Claim, or after the date of the Schedules if no Proof of Claim was filed.

If any Holder's Distribution is returned as undeliverable, a reasonable effort will be made to determine the current address of such Holder, but no further Distributions to such Holder will be made unless and until the Reorganized Debtors are notified of such Holder's then current address, at which time all missed Distributions will be made to such Holder, without interest. Unless otherwise agreed by the Reorganized Debtors, amounts with respect to undeliverable Distributions made by the Reorganized Debtors will be returned to and for the benefit of the Reorganized Debtors.

All Claims for undeliverable Distributions must be made within the later of six (6) months after the Effective Date or six (6) months after Distribution is made to such Holder; after which date all Unclaimed Property will revert to the Reorganized Debtors free of any restrictions thereon and the Claims of any Holder or successor to such Holder with respect to such property will be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

(4)    Means of Cash Payment

The Plan provides that Cash payments made pursuant to the Plan will be in U.S. funds, by the means agreed to by the payor and the payee, including by check, and/or wire transfer or, in the absence of an agreement, such commercially reasonable manner as the payor will determine in its sole discretion.  For purposes of effectuating Distributions under the Plan, any Claim denominated in foreign currency will be converted to U.S. Dollars pursuant to the applicable published exchange rate in effect on the Petition Date.

(5)    Fractional Distributions

The Plan provides that notwithstanding any other provision of the Plan to the contrary, no payment of fractional cents will be made pursuant to the Plan.  Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made will reflect a rounding of such fraction to the nearest whole penny (up or down), with half cents or more being rounded up and fractions less than half of a cent being rounded down.

(6)    De Minimis Distributions

The Plan provides that notwithstanding anything to the contrary contained in the Plan, the Reorganized Debtors will not be required to distribute, and will not distribute, Cash to the Holder

of any Allowed Claim if the amount of Cash to be distributed on account of such Claim is less than five dollars ($5.00). Any Holder of an Allowed Claim on account of which the amount of Cash or other Property to be distributed is less than five dollars ($5.00) will have such Claim discharged and will be forever barred from asserting such Claim against the Debtors, the Reorganized Debtors, or their respective Property. Any Cash not distributed pursuant to this provision will be the property of the Reorganized Debtors, free of any Liens, Claims, Equity Interests, or restrictions thereon.

<center>(7)    <u>Reserves for Disputed Claims; Distributions on Account Thereof</u></center>

The Plan contemplates the establishment and maintenance of Reserves on account of Class 5 Unsecured Claims that are Disputed Claims as of the Effective Date. No payments or Distributions will be made on account of a Disputed Claim or, if less than the entire Claim is a Disputed Claim, the portion of a Claim that is Disputed, until such Claim becomes an Allowed Claim.

With respect to any Administrative Expense Claim, other than an Administrative Expense Claim that has been Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court or that was incurred by the Debtors in the ordinary course of business during the Reorganization Cases, a Disputed Claim is a Claim that is Contingent or Disputed and subject to liquidation through pending or prospective litigation including, but not limited to, alleged obligations arising from personal injury, property damage, products liability, consumer complaints, employment law (excluding Claims arising under workers' compensation law), secondary payor liability, or any other Disputed legal or equitable Claim based on tort, statute, contract, equity, or common law.

With respect to any Claim that is not an Administrative Expense Claim, other than a Claim that has been Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court, a Disputed Claim is a Claim: (a) if no Proof of Claim has been filed or deemed to have been filed by the applicable Bar Date, that has been or hereafter is listed on the Schedules as unliquidated, Contingent, or Disputed; (b) if a Proof of Claim has been filed or deemed to have been filed by the applicable Bar Date, as to which a Debtor has timely filed an objection or request for estimation in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, and any Orders of the Bankruptcy Court, or which is otherwise disputed by a Debtor in accordance with applicable law, which objection, request for estimation, or dispute has not been withdrawn or determined by a Final Order; (c) for which a Proof of Claim was required to be filed by the Bankruptcy Code, the Bankruptcy Rules, or an Order of the Bankruptcy Court, but as to which a Proof of Claim was not timely or properly filed; (d) for damages based upon the rejection by a Debtor of an Executory Contract under Section 365 of the Bankruptcy Code and as to which the applicable Bar Date has not passed; (e) that is Disputed under the provisions of the Plan; or (f) if not otherwise Allowed, as to which the applicable Claims Objection Deadline has not expired.

The Reorganized Debtors will, on the applicable Distribution Dates, make Distributions on account of any Disputed Claim that has become an Allowed Claim. Such Distributions will be made pursuant to the provisions of the Plan governing the applicable Class. Such Distributions will be based solely upon the amount of the Distributions that would have been

made to the Holder of such Claim under the Plan if the Disputed Claim had been an Allowed Claim on the Effective Date in the amount ultimately Allowed.

### (8) Objection Procedures

All objections to Claims, other than Claims that are deemed to be Disputed Claims, must be filed and served on the Holders of such Claims by the Claims Objection Deadline. Objections to Claims (other than Administrative Claims), shall be filed on the later of ninety (90) days after the Effective Date, or (b) ninety (90) days after the applicable Proof of Claim is filed. If an objection has not been filed to a Proof of Claim or a scheduled Claim by the Claims Objection Deadline, unless such Proof of Claim asserts a Claim that is deemed to be a Disputed Claim, the Claim to which the Proof of Claim or scheduled Claim relates will be treated as an Allowed Claim if such Claim has not been Allowed earlier.

### (9) Estimation of Contingent or Unliquidated Claims

The Debtors or Reorganized Debtors may, at any time, request that the Bankruptcy Court estimate any Contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code, regardless of whether the Debtors or Reorganized Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event the Bankruptcy Court so estimates any Contingent or unliquidated Claim, that estimated amount will constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, as applicable and as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another. Claims may be estimated and thereafter resolved by any permitted mechanisms.

### (10) Impact of Disputed Claims on Unsecured Claims Recovery

The Debtors may seek one or more Final Orders of the Bankruptcy Court disallowing certain Claims. However, to protect the rights of Holders of such Disputed Claims, the Plan proposes to establish a Disputed Claims Reserve. The Debtors will seek to determine a maximum potentially allowable amount for all Disputed Claims, obtaining Orders of the Bankruptcy Court where necessary to estimate or fix the maximum amount. It would be the Debtors' expectation that many of the Disputed Claims will be disallowed in whole or part, and that the funds placed in the Disputed Claims Reserve on their account will not be distributed to the Holders of such Claims and the funds reallocated to other uses.

### (11) Maximum Distributions for Claims

No Holder of a Claim will receive a recovery that is valued as of the Effective Date to exceed 100% of such Holder's Allowed Claim. Likewise, no Holder of a Claim shall receive a recovery that exceeds one hundred percent (100%) of such Holder's Allowed Claim as of the

Effective Date resulting from a decrease in the amount of Administrative Expense Claims, Priority Claims, Priority Tax Claims, and Secured Claims as determined on the Effective Date and/or an increase in the amount of Cash available to the Debtors to satisfy such Claims as determined on the Effective Date.

<div align="center">(12)   <u>Reservation of Rights Regarding Claims</u></div>

Except as otherwise explicitly provided in the Plan, nothing will affect the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Claims including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of Set-Off or recoupment.

## B.   <u>Disposition of Executory Contracts</u>

The Plan provides for the deemed rejection of all Executory Contracts that have not been otherwise disposed of previously, except with regard to any submerged land leases in favor of the Reorganized Debtors. Specifically, except as otherwise provided in the Plan as of the Effective Date, the Debtors will be deemed to have rejected each pre-petition Executory Contract to which it is a party unless such Executory Contract (a) was previously assumed or rejected upon motion by a Final Order, (b) previously expired or terminated pursuant to its own terms, or (c) is the subject of any pending motion, including a motion to assume, to assume on modified terms, to reject, or to make any other disposition filed by the Debtors on or before the Effective Date. The Confirmation Order will constitute an Order of the Bankruptcy Court under Section 365(a) of the Bankruptcy Code approving the rejection of pre-petition Executory Contracts described above, as of the Effective Date. Notwithstanding the foregoing, the Debtors reserve the right to seek the assumption of an Executory Contract and the assignment of the same to a third party (such as BB&T) to the extent necessary to effectuate the treatment of such party's Claim under the Plan.

<div align="center">(1)   <u>Rejection Damages Bar Date for Rejections Pursuant to Plan</u></div>

If the rejection of an Executory Contract pursuant to the Plan results in a Claim, then such Claim will be forever barred and will not be enforceable against any Debtors or Reorganized Debtors or the Properties of any of them unless a Proof of Claim is filed with the Bankruptcy Court and served upon counsel to the Reorganized Debtors within thirty (30) days after the notice of entry of the Order authorizing the rejection of such Executory Contract. The foregoing applies only to Claims arising from the rejection of an Executory Contract; any other Claims held by a party to a rejected Executory Contract will have been evidenced by a Proof of Claim filed by earlier applicable bar dates or will be barred and unenforceable.

<div align="center">(2)   <u>Cure with Respect to Assumed Executory Contracts</u></div>

Any monetary amounts by which any Executory Contract to be assumed pursuant to the Plan is in default will be satisfied, under Section 365(b)(1) of the Bankruptcy Code, by Cure. To the extent an assumed Executory Contract is assigned to a third party (such as BB&T), such third party shall be solely and fully responsible for satisfaction of the Cure requirements under Section 365(b). If there is a dispute regarding (a) the nature or amount of any Cure, (b) the ability of any

Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the Executory Contract to be assumed, or (c) any other matter pertaining to assumption, Cure will occur following the entry of a Final Order by the Bankruptcy Court resolving the dispute and approving the assumption or assumption and assignment, as the case may be; provided however, that the Reorganized Debtors will be authorized to reject any Executory Contract to the extent the Reorganized Debtors, in the exercise of their sound business judgment, conclude that the amount of the Cure obligation, as determined by such Final Order, renders assumption of such Executory Contract unfavorable to the Reorganized Debtors. **THE DEBTORS DO NOT BELIEVE ANY CURE IS REQUIRED WITH RESPECT TO ANY EXECUTORY CONTRACT THAT WILL BE ASSUMED.**

## C.     Revesting of Assets; Release of Liens

The Property of the Debtors' Estates, together with any property of the Debtors that is not Property of their Estates and that is not specifically disposed of or abandoned pursuant to the Plan, will revest in the respective Debtors on the Effective Date (unless the Debtors are merged as a single surviving entity, as contemplated in the Plan). Thereafter, the Reorganized Debtors may operate their businesses and may use, mortgage, acquire, and dispose of such property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court. As of the Effective Date, all such Property of the Reorganized Debtors will be free and clear of all Liens, Claims, encumbrances, and Equity Interests of any kind, type, or nature whatsoever except as otherwise specifically provided under the Plan.

## VIII.    POST-CONSUMMATION CORPORATE STRUCTURE, MANAGEMENT, OPERATION, AND DISCHARGE INJUNCTIONS

## A.     Continued Corporate Existence

The Plan provides that Debtors will remain in existence in accordance with the applicable laws in the respective jurisdictions in which they are incorporated. The Debtors may elect at Confirmation to effect a corporate merger as of the Effective Date pursuant to the Plan, with the surviving corporate entity having all of the powers of a corporation under applicable law in the jurisdiction in which the Debtors are organized or otherwise formed.

## B.     Post-Consummation Governance Documents

The governing corporate documents for the Debtors may be amended as necessary to include a provision prohibiting the issuance of non-voting equity securities to the extent required by Section 1123(a)(6) of the Bankruptcy Code.

## C.     Officers and Directors of Reorganized Debtors

The Debtors currently anticipate that the Board of Directors (the "Board") and officers of the Reorganized Debtors shall be the same persons who served in such capacity prior to the Petition Date. Currently, these are Joseph Borda and Marlene Borda.

## D.    Corporate Action

On the Effective Date, the adoption and filing of any restated articles of incorporation, the appointment of directors and officers of Reorganized Debtors, and all actions contemplated by the Plan, will be authorized and approved in all respects pursuant to the Plan.  All matters provided for in the Plan involving the corporate structure of the Debtors or Reorganized Debtors and any corporate action required by the Debtors or Reorganized Debtors in connection with the Plan will be deemed to have occurred and will be in effect without any requirement of further action by the stockholders or directors of the Debtors or Reorganized Debtors.  On the Effective Date, the appropriate officers or directors of the Reorganized Debtors will be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan in the name of and on behalf of the Reorganized Debtors without the need for any required approvals, authorizations, or consents, except for express consents required under the Plan.

## E.    Discharge and Discharge Injunction

Confirmation of the Plan effects a discharge of all Claims against the Debtors.  As set forth in the Plan, except as otherwise provided therein or in the Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of all Claims of any nature whatsoever against the Debtors or any of their assets or Properties and, regardless of whether any Property will have been abandoned by Order of the Bankruptcy Court, retained, or distributed pursuant to the Plan on account of such Claims, upon the Effective Date, the Debtors will be deemed discharged and released under Section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in Section 502 of the Bankruptcy Code, whether or not (i) a Proof of Claim based upon such debt is filed or deemed filed under Section 501 of the Bankruptcy Code, (ii) a Claim based upon such debt is Allowed under Section 502 of the Bankruptcy Code, (iii) a Claim based upon such debt is or has been Disallowed by Order of the Bankruptcy Court, or (iv) the Holder of a Claim based upon such debt accepted the Plan.

Under the Plan, as of the Effective Date, except as provided in the Plan or the Confirmation Order, all Persons will be precluded from asserting against the Debtors or the Reorganized Debtors, directly or indirectly, any other or further Claims, debts, rights, Causes of Action, claims for relief, liabilities, or Equity Interests relating to the Debtors based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date.  In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtors pursuant to Sections 524 and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged Claim.

In furtherance of the discharge of Claims, the Plan provides that, except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold, may hold, or allege that they hold, a Claim or other debt or liability that is discharged or an

Equity Interest or other right of an Equity Security Holder that is terminated pursuant to the terms of the Plan, are permanently enjoined from taking any of the following actions against the Debtors, the Reorganized Debtors, and their respective subsidiaries or their Property on account of any such discharged Claims, debts, or liabilities: (a) commencing or continuing, in any manner or in any place, any action or other proceeding; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or Order; (c) creating, perfecting, or enforcing any Lien or encumbrance; (d) asserting a Set-Off, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtors or the Reorganized Debtors; or (e) commencing or continuing any action, in each such case in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of the Plan.

(1)    <u>Discharge of Claims and Non-Debtor Releases.</u>

**THE PLAN AND THE CONFIRMATION ORDER SHALL ACT AS A DISCHARGE AND RELEASE OF THE GUARANTORS (THE "<u>RELEASED PARTIES</u>") FROM ANY CLAIMS, LIABILITIES, AND OBLIGATIONS ARISING IN CONNECTION WITH THE DEBTORS' PRE-PETITION BUSINESS OPERATIONS INCLUDING, WITHOUT LIMITATION, ANY GUARANTY OF ANY OBLIGATION OR DEBT OF THE DEBTORS (THE "<u>GUARANTY CLAIMS</u>"). IN CERTAIN INSTANCES, SUCH RELEASES ARE WITH THE CONSENT OF THE AFFECTED CREDITOR AS SET FORTH IN THE PLAN. UNLESS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, THE RELEASE AND DISCHARGE OF THE RELEASED PARTIES UNDER THE PLAN IS IN CONSIDERATION OF AND CONDITIONED UPON THE RELEASED PARTIES PROVIDING THE CONSIDERATION FOR SUCH A RELEASE IN THE FORM OF THE EXIT FINANCING, THE FULL SATISFACTION OF ALL CLAIMS UNDER THE PLAN, AND/OR EFFECTING THE SATISFACTION OF THE DIP LOAN THROUGH CONSIDERATION OTHER THAN A CASH PAYMENT ON THE EFFECTIVE DATE (THE "<u>CONTRIBUTIONS</u>"). WITHOUT LIMITING THE GENERALITY OF AND SUBJECT TO THE FOREGOING, ON THE EFFECTIVE DATE, THE RELEASED PARTIES SHALL BE DISCHARGED FROM ANY GUARANTY CLAIM WHETHER OR NOT (A) A PROOF OF CLAIM BASED ON SUCH GUARANTY CLAIM WAS FILED PURSUANT TO SECTION 501 OF THE BANKRUPTCY CODE, (B) A GUARANTY CLAIM IS AN ALLOWED CLAIM PURSUANT TO SECTION 502 OF THE BANKRUPTCY CODE, (C) THE HOLDER OF A GUARANTY CLAIM HAS VOTED TO ACCEPT THE PLAN, OR (D) ANY LEGAL ACTION HAD BEEN COMMENCED AS OF THE CONFIRMATION DATE ON ACCOUNT OF SUCH GUARANTY CLAIM AGAINST THE DEBTORS OR THE RELEASED PARTIES. AS OF THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES, INCLUDING ALL HOLDERS OF A CLAIM SHALL BE FOREVER PRECLUDED AND PERMANENTLY ENJOINED TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW FROM ASSERTING DIRECTLY OR INDIRECTLY AGAINST THE RELEASED PARTIES, OR THEIR ASSETS OR PROPERTIES, ANY OTHER OR FURTHER CLAIMS, DEBTS, RIGHTS, CAUSES OF ACTION, REMEDIES, OR LIABILITIES BASED UPON ANY ACT, OMISSION, DOCUMENT, INSTRUMENT, TRANSACTION, OR OTHER ACTIVITY OF ANY**

**KIND OR NATURE THAT CONSTITUTES A GUARANTY CLAIM OR THAT OCCURS IN CONNECTION WITH IMPLEMENTATION OF THE PLAN AND THE CONFIRMATION ORDER SHALL CONTAIN APPROPRIATE INJUNCTIVE LANGUAGE TO THAT EFFECT. IN ACCORDANCE WITH THE FOREGOING, THE CONFIRMATION ORDER SHALL BE A JUDICIAL DETERMINATION OF THE DISCHARGE OF ALL SUCH GUARANTY CLAIMS AND OTHER DEBTS AND LIABILITIES AGAINST THE RELEASED PARTIES, AND SUCH DISCHARGE SHALL VOID ANY JUDGMENT OBTAINED AGAINST THE RELEASED PARTIES, AT ANY TIME, TO THE EXTENT THAT SUCH JUDGMENT RELATES TO A DISCHARGED GUARANTY CLAIM. THE FOREGOING RELEASE AND DISCHARGE SHALL NOT APPLY TO CLAIMS OR CAUSES OF ACTION THAT ARISE FROM OBLIGATIONS OR RIGHTS CREATED UNDER OR IN CONNECTION WITH THE PLAN OR ANY AGREEMENT PROVIDED FOR OR CONTEMPLATED IN THE PLAN.**

(2)     Guaranty Injunction.

On or after the Effective Date, all Persons shall be permanently and forever stayed, restrained, and enjoined from taking any of the following actions for the purpose of directly or indirectly collecting, recovering, or receiving payment of, on, or with respect to any Guaranty Claims: (a) commencing, conducting, or continuing in any manner, directly or indirectly, any proceeding in any forum against or affecting the Released Parties; (b) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other Order against the Released Parties, or any property or interest in property of the Released Parties; (c) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against the Released Parties, or any property or interest in property of the Released Parties; (d) setting off, seeking reimbursement of, contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to the Released Parties; and (e) commencing or continuing in any manner any action or other proceeding of any kind against the Released Parties or any property or interest in property of the Released Parties. The sole recourse of the Holder of a Guaranty Claim shall be as provided for in the Plan, and any such Holder thereof shall have no right whatsoever at any time to assert its Guaranty Claim against the Released Parties or any property or interest in property of the Released Parties, regardless of whatever recovery such Holder obtains or does not obtain from the Debtors.

(3)     Rule 3016(c) Declaration

In accordance with the requirements of Federal Rule of Bankruptcy Procedure 3016(c), the Plan operates to specifically release the Released Parties from all Claims and enjoins certain actions in connection with such release. Such releases and injunctions cover the Released Parties, whose Contributions are so critical to the reorganization effort that without them, the reorganization would fail. The Debtors believe that without the protections of such injunctions and the release, they would be unable to consummate their Plan for the benefit of all of their Creditors. The releases and injunctions apply to all Creditors of the Debtors whose Claims

against the Debtors were guaranteed by the Released Parties or who may otherwise assert that the Released Parties are liable for some or all of such Claims.

<div align="center">(4)     <u>Necessity of Third Party Release And Guaranty Injunction</u></div>

Generally, under Section 524(e) of the Bankruptcy Code, the discharge of a debt of a debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt. However, that section of the Bankruptcy Code does not expressly bar non-debtor releases under a Chapter 11 plan. The Plan provides for non-debtor releases of the Released Parties. These releases are crucial to the Plan and are being granted in exchange for valuable consideration provided by the Released Parties that benefits the Estates and their Creditors in the form of the Contributions. Importantly, because the guarantees are related to the Secured Claims, which are being satisfied in full, these Secured Creditors would not be prejudiced by these releases. In the case of BB&T, the release of the Guarantors is being provided consensually in connection with the treatment under the Plan.

Courts in the Eleventh Circuit have acknowledged a bankruptcy court's ability to approve non-debtor releases, both in settlement agreements and Chapter 11 plans, so long as certain standards are met. *See* <u>In re Munford, Inc.</u>, 97 F.3d 449 (11th Cir. 1996); <u>In re Transit Group</u>, 286 B.R. 811 (M.D. Fla. 2002). In those cases, courts have generally considered whether the requested releases were crucial to the success of the bankruptcy case, that the requested non-debtor releases are fair and necessary, and that the releases be given in exchange for appropriate consideration.

These Reorganization Cases have truly unusual circumstances that justify the non-debtor releases and injunctions. The Released Parties are procuring the Exit Financing and/or contributing the satisfaction that they would otherwise be entitled to for their Claims and DIP Loan and the Creditors most affected by the releases are having their Allowed Claims satisfied in full. The unique circumstances of these Reorganization Cases clearly justify the requested non-debtor releases. Without the releases contemplated by the Plan, the Released Parties would not provide the consideration necessary to consummate the Plan. Such performance is, in turn, an unquestionably essential element of the Debtors' ultimate reorganization and adds considerable value to their assets. The waiver and release of the Guaranty Claims under the Plan is necessary to make the Plan both feasible and confirmable. As such, the permanent injunctions against future lawsuits against the Released Parties under the Plan are essential to Confirmation of the Plan.

<div align="center"><b>IX.    <u>PREFERENCES, FRAUDULENT CONVEYANCES, AND OTHER CAUSES OF ACTION</u></b></div>

Under the Plan, all Claims, rights of action, suits, or proceedings, whether in law or in equity, whether known or unknown, that the Debtors or their Estates may hold against any Person ("<u>Causes of Action</u>") are retained by the Reorganized Debtors after Confirmation of the Plan (except to the extent such Claims are expressly released under the Plan). The Debtors may also elect, prior to Confirmation, to pursue litigation against any Person (and/or any related guarantees) arising out of a debt to the Debtors. The Plan provides that except as otherwise provided in the Plan or the Confirmation Order, or in any contract, instrument, release, indenture,

or other agreement entered into in connection with the Plan, in accordance with Section 1123(b) of the Bankruptcy Code, on the Effective Date, the Debtors or Reorganized Debtors will retain all of the respective Causes of Action that the Debtors or Reorganized Debtors may hold against any Person.

Causes of Action include potential Avoidance Actions. The deadline for commencing these actions is two (2) years after the Petition Date. A decision with respect to whether to pursue such actions will be made by the Reorganized Debtors prior to the expiration of that deadline. All Creditors and other parties who received potentially preferential payments are advised that such payments are subject to possible avoidance in proceedings to be commenced by the Reorganized Debtors.

No Creditor or other party should vote for the Plan or otherwise rely on the Confirmation of the Plan or the entry of the Confirmation Order in order to obtain, or on the belief that they will obtain, any defense to any Causes of Action. No Creditor or other party should act or refrain from acting on the belief that it will obtain any defense to any Cause of Action. Additionally, the Plan does not, and is not intended to, release any Causes of Action or objections to Claims, and all such rights are specifically reserved in favor of the Reorganized Debtors. Creditors are advised that legal rights, claims, and rights of action the Debtors may have against them, if they exist, are retained under the Plan for prosecution unless expressly released. As such, Creditors are cautioned not to rely on (a) the absence of the listing of any legal right, claim, or right of action against a particular Creditor in the Disclosure Statement, the Plan, or the Schedules, or (b) the absence of litigation or demand prior to the Effective Date of the Plan as any indication that the Reorganized Debtors do not possess or do not intend to prosecute a particular Claim or Cause of Action if a particular Creditor votes to accept the Plan. It is the expressed intention of the Plan to preserve rights, claims, and rights of action of the Debtors, whether now known or unknown, for the benefit of the Estates and the Debtors' Creditors. A Cause of Action shall not, under any circumstances, be waived as a result of the failure of the Debtors to describe such Cause of Action with specificity in the Plan or the Disclosure Statement.

## X.  RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND ANY SUPPLEMENTS TO THIS DISCLOSURE STATEMENT) PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### A.  General Bankruptcy Risk Factors

The Debtors cannot assure that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, the Debtors cannot assure that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of a Claim or Equity Interest might challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that the

Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any statutory requirements for Confirmation had not been met.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the confirmation of the plan is not likely to be followed by a liquidation or a need for further financial reorganization and that value of distributions to non-accepting holders of claims and equity interests within a particular class under the plan will not be less than the value of distributions such holders would receive if the debtor was liquidated under Chapter 7 of the Bankruptcy Code. The Debtors believe that the Plan will not be followed by a need for further financial reorganization and that Holders within each Class under the Plan will receive Distributions at least as great as would be received following a liquidation under Chapter 7 of the Bankruptcy Code when taking into consideration all Administrative Expense Claims and the costs and uncertainty associated with any such Chapter 7 case.

## B. Uncertainty of Plan Assumptions

The Plan is based on numerous assumptions, including Confirmation and consummation of the Plan in accordance with its terms; realization of the values of the Property; market performance; no material adverse changes in applicable legislation or regulations, or the administration thereof; no material adverse changes in general business and economic conditions; no material adverse changes in competition; the Reorganized Debtors' retention of key management and other key employees; adequate post-Effective Date financing; the absence of material Contingent or unliquidated litigation, indemnity, or other Claims; and other matters, many of which will be beyond the control of the Reorganized Debtors, and some or all of which may not materialize.

To the extent that any assumption is based upon future business decisions and objectives, they are subject to change. In addition, although they are presented with numerical specificity and are based on assumptions considered reasonable by the Debtors, the assumptions and estimates are subject to significant business, economic, and competitive uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtors. Some or all of the assumptions may not be realized and that actual results may vary. Assumptions contained in the Disclosure Statement should not be regarded as a representation or warranty by the Debtors or any other Person that such assumption can or will be achieved.

## C. Operational Risk Factors

The Debtors will face a number of risks with respect to its continuing business operations upon emergence from Chapter 11, including but not limited to the following: the Debtors' ability to improve cash flows from sales; the Debtors' response to the entry of new competitors into their markets; the Debtors' ability to reduce the level of operating losses experienced in recent years; the Debtors' ability to successfully implement effective business continuity; changes in federal, state, or local laws or regulations; general economic conditions in the Debtors' operating regions; increases in labor and employee benefit costs, such as health care

and related expenses; and changes in accounting standards, taxation requirements, and bankruptcy laws.

## XI.     CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.     General

The tax consequences of the Plan to the Debtors and to Holders of Claims and Equity Interests are discussed below.  This discussion of the federal income tax consequences of the Plan under U.S. federal income tax law, including the Internal Revenue Code of 1986, as amended (the "IRC" or "Tax Code"), is provided for informational purposes only.  While this discussion addresses certain of the material tax consequences of the Plan, it is not a complete discussion of all such consequences and is subject to substantial uncertainties.  Moreover, the consequences to Holders of Claims and Equity Interests may be affected by matters not discussed below (including, without limitation, special rules applicable to certain types of taxpayers holding non-vested stock or otherwise subject to special rules, nonresident aliens, life insurance companies, and tax-exempt organizations) and by such Holders' particular tax situations.  In addition, this discussion does not address any state, local, or foreign tax considerations that may be applicable to particular Holders.

**THE DEBTORS' BANKRUPTCY COUNSEL HAS NO TAX EXPERTISE AND HAS NOT RESEARCHED OR ANALYZED TAX CONSEQUENCES RESULTING FROM THE PLAN.  HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES.**

### B.     Certain U.S. Federal Income Tax Consequences to Holders of Claims and Equity Interests

(1)     Consequences to Holders of Secured Claims.

The following discussion assumes that each Holder of an Allowed Secured Claim holds such Claim as a "capital asset" within the meaning of Section 1221 of the IRC.  If an Allowed Secured Claim remains secured by a Lien on the Debtors' assets, the Holder of such Claim should not recognize a gain or less except to the extent Collateral securing such Claim is changed, and the change in Collateral constitutes a "significant modification" of the Allowed Secured Claim within the meaning of Treasury Regulations promulgated under Section 1001 of the IRC.  If an Allowed Secured Claim is paid in full in Cash, the Holder should recognize a capital gain or loss (which capital gain or loss would be a long-term capital gain or loss to the extent that the Holder has held the debt instrument underlying its Claim for more than one (1) year) in an amount equal to the amount of Cash received over the Holder's adjusted basis in the debt instrument(s) underlying its Allowed Secured Claim.  To the extent that a portion of the Cash received represents accrued but unpaid interest that the Holder has not already taken into income, the Holder may recognize ordinary interest income.

(2)      Consequences to Holders of Priority Claims.

To the extent that the Holder of an Allowed Priority Claim receives a Distribution under the Plan, such Holder should recognize such Distribution as ordinary income and submit the appropriate withholdings based on that Holder's particular circumstances. The Reorganized Debtors shall make any appropriate withholdings from such Distributions.

(3)      Consequences to Holders of Unsecured Claims.

To the extent the Holder of an Allowed General Unsecured Claim receives less than full payment on account of such Claim, the Holder of such Claim may be entitled to assert a bad debt deduction or worthless security deduction with respect to such Allowed Unsecured Claim.

To the extent that any amount received by a Holder of an Allowed Unsecured Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the Holder's gross income, such amount should be taxable to the Holder as ordinary interest income. Conversely, a Holder of an Allowed Unsecured Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such Claim was previously included in the Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

(4)      Consequences to Holders of Equity Interests.

The Debtors are corporations and Equity Interests may be cancelled under the Plan.

**C.      Certain U.S. Federal Income Tax Consequences of the Plan to the Debtor**

(1)      Cancellation of Indebtedness Income.

Under the Tax Code, a U.S. taxpayer generally must include in gross income the amount of any cancellation of indebtedness income ("COD Income") realized during the taxable year, which generally includes the amount of principal debt discharged and any interest that has been previously accrued and deducted for tax purposes but remains unpaid at the time the indebtedness is discharged. The Tax Code permits a debtor in bankruptcy to exclude its COD Income from gross income, but requires the debtor to reduce certain tax attributes by the amount of the excluded COD Income. A debtor's tax attributes include net operating loss ("NOL") carry forwards, current year NOLs, tax credits, and tax basis in assets (collectively, "Tax Attributes"). To the extent the amount of excluded COD Income exceeds the Tax Attributes available under the ordering rules found in the treasury regulations related to members of a consolidated group, the remaining COD Income generally has no adverse federal income tax consequences.

It is likely that the Debtors will realize a significant amount of COD Income upon the consummation of the Plan. However, the Debtors will not be required to include COD Income in gross income because the indebtedness will be discharged while the Debtors are under the jurisdiction of a court in a Title 11 case. Instead, the Debtors will be required to reduce Tax Attributes by the amount of the COD Income realized. The Debtors have not yet

determined whether it would be beneficial to make an election available under the Tax Code to reduce the basis of its depreciable property prior to any reduction of NOLs or other Tax Attributes. The extent to which NOLs and other Tax Attributes remain following Tax Attribute reduction, and the extent of the reduction in the basis of the Debtors' assets, will depend upon the amount of the COD Income. The Debtors have not analyzed the tax consequences or the impact on NOLs and other Tax Attributes that may be occasioned by the issuance of the new stock under the Plan.

(2)    Limitation on NOL Carry Forwards and Other Tax Attributes.

The Debtors may show substantial NOL carry forwards in their 2010 tax returns. The amount of the Debtors' NOL carryovers will be significantly reduced or eliminated as a result of the reduction of Tax Attributes described above. Additionally, the Debtors' ability to utilize certain Tax Attributes allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") may be subject to limitation pursuant to Section 382 of the Tax Code ("Section 382") to the extent a "change in ownership" of the Debtors occurs upon emergence from bankruptcy, as described below.

(3)    General Section 382 Limitation

In general, when a corporation undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the Bankruptcy Exception discussed below, Section 382 limits the corporation's ability to utilize NOL carry forwards and certain built-in losses following the ownership change. The Debtors may undergo an ownership change as a result of the Plan. The Debtors also estimate that they will have a substantial "net unrealized built-in loss" (discussed below), and that under Section 382 its ability to utilize such loss may be limited.

In general, unless the Bankruptcy Exception (defined in Section 4 below) applies, Section 382 places an annual limitation on a corporation's use of NOL carry forwards equal to the fair market value of the stock of the corporation multiplied by the highest of the adjusted federal "long-term tax-exempt rates" in effect for any month in the three-calendar-month period ending with the month in which the ownership change occurs (the "Annual Limitation"). For a corporation in bankruptcy that undergoes a change of ownership pursuant to a confirmed plan, the stock value generally is determined immediately after (rather than before) the ownership change.

Unless the Bankruptcy Exception applies, for any taxable year ending after an ownership change, the NOLs that can be used in that year to offset taxable income of a corporation cannot exceed the amount of the Annual Limitation. Any unused Annual Limitation may be carried forward, thereby increasing the amount of NOLs available to offset income in the subsequent taxable year. The Annual Limitation is reduced if a second ownership occurs and is eliminated if the corporation does not continue its historic business or uses a significant portion of its assets in a new business.

(4)     Bankruptcy Exception

Section 382 provides an exception to the Annual Limitation for corporations under the jurisdiction of a court in a Title 11 case (the "Bankruptcy Exception") if shareholders of the debtor immediately before an ownership change and qualified (so-called "historic" or "qualified") creditors of a debtor receive, in respect of their claims, stock with at least fifty percent (50%) of the vote and value of all the stock of the reorganized debtor pursuant to a confirmed bankruptcy plan of reorganization. If the Debtors cancel the existing Equity Interests and issue new stock, the Debtors may not be eligible for the Bankruptcy Exception.

(5)     Alternative Minimum Tax

In general, a federal alternative minimum tax ("AMT") of twenty percent (20%) is imposed on a corporation's alternative minimum taxable income if such tax exceeds the corporation's regular federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. For example, only ninety percent (90%) of a corporation's taxable income for AMT purposes may be offset by available NOL carry forwards (as computed for AMT purposes). In addition, if a corporation undergoes an "ownership change" within the meaning of Section 382 of the Tax Code and has a net unrealized built-in loss on the date of the ownership change, the corporation's aggregate tax basis in its assets would be reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date. Although not entirely clear, it appears that the application of this provision to the Debtors would be unaffected by whether the Debtors otherwise qualify for the Bankruptcy Exception.

## D.     Backup Withholding and Reporting

The Reorganized Debtors will withhold all amounts required by law to be withheld from payments subject to federal taxes, if any, and will comply with all applicable reporting requirements of the IRC.

## E.     IRS Circular 230 Notice

Any tax advice contained in this Disclosure Statement (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the IRC, or (ii) promoting, marketing, or recommending to another party any tax-related matter addressed herein.

## XII.     FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS

## A.     Feasibility of the Plan

In connection with Confirmation of the Plan, the Bankruptcy Court will be required to determine that the Plan is feasible pursuant to Section 1129(a)(11) of the Bankruptcy Code, which means that the Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors.

The Debtors believe that the Plan is feasible as to the Allowed Secured Claims by the surrender of a substantial portion of the Debtors' Property. The Debtors base their belief as to the significant value of this to-be-transferred Property, in part, on various appraisals that were previously obtained at the requests of the Secured Creditors, Mr. Borda's more than 25 years of experience in real estate development in the area, the Debtors' investigation and research in the current market, and the valuation information completed by the Debtors' valuation expert. In light of the settlements with the Debtors' Secured Creditors, the amount of Unsecured Claims, the Contributions to be made by the Guarantors, and the value of the Debtors' Retained Property, the Plan is feasible and provides for the full payment of all Allowed Claims.

Accordingly, the Debtors believe that the Plan complies with the financial feasibility standard of Section 1129(a)(11) of the Bankruptcy Code. The Debtors may update or otherwise revise these assumptions, including any revisions to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events.

## B.    <u>Liquidation Analysis</u>

Even if a plan is accepted by each class of creditors and equity security holders, in order to confirm a plan of reorganization, the Bankruptcy Court must independently determine that the plan is in the best interests of all classes of creditors and equity security holders impaired by the plan. The "best interests" test requires that the Bankruptcy Court find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide such members a recovery that has a value at least equal to the value of the distribution that each such member would receive if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

To calculate what members of each impaired class of creditors and equity security holders would receive if a debtor were liquidated, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its Chapter 11 case were converted to a Chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the Debtors' assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of the Collateral and, then, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the Chapter 7 case and, then, the Chapter 11 case. Costs of liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the debtor in the Chapter 11 case (such as compensation of attorneys, financial advisors, and accountants) that are Allowed in the Chapter 7 case, litigation costs and claims arising from the operations of the debtor during the pendency of the Chapter 11 case. The liquidation itself could trigger certain priority claims, such as claims for severance pay, and could accelerate other priority payments that otherwise would be due in the ordinary course of business, such as litigation costs and claims arising from the wind-down of the debtor's operations during the Chapter 7 case. Those administrative and priority claims would be paid in full out of the liquidation proceeds before the balance would be made available to pay general claims or to make any distribution in respect of equity interests.

The Debtors believe that a Chapter 7 liquidation would result in recoveries substantially less than the recoveries expected to be received pursuant to the Plan and that these reduced recoveries would be received at a much later time. As mentioned above, the Debtors have attached a Liquidation Analysis assuming three hypothetical Chapter 7 liquidation cases in which a court-appointed trustee liquidates the companies' assets pursuant to a forced liquidation. The Liquidation Analysis shows that two of the three Debtors would have insufficient funds to pay unsecured claims, which is part of the Debtors' decision to seek substantive consolidation.

The Liquidation Analysis is based on a number of estimates and assumptions, which, while considered reasonable, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors or any Chapter 7 trustee. Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a Chapter 7 liquidation, and actual results could vary materially from those shown here. In addition, any liquidation would necessarily take place in the future under circumstances which presently cannot be predicted. Accordingly, if the Debtors' Estates were in fact liquidated, the actual liquidation proceeds could be materially lower or higher than the amounts set forth below and no representation or warranty can be or is being made with respect to the actual proceeds that could be received in a Chapter 7 liquidation.

## XIII.  SUMMARY, RECOMMENDATION, AND CONCLUSION

The Plan provides for an orderly and prompt Distribution to Holders of Allowed Claims and the satisfaction of all asserted Claims and Equity Interests. In the opinion of the Debtors, the Plan provides for a larger Distribution to the Debtors' Creditors than would otherwise result in liquidation under Chapter 7 of the Bankruptcy Code. In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller Distributions to Holders of Allowed Claims than proposed under the Plan.

*Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.*

Dated: October 14, 2011

SEAVIEW PLACE DEVELOPERS, INC.

By:   */s/ Joseph Borda*
         Joseph Borda, President

GULF LANDINGS DEVELOPMENT CORPORATION

By:   */s/ Joseph Borda*
         Joseph Borda, President

HARBOR COLONY DEVELOPMENT, INC.

By:   */s/ Joseph Borda*
         Joseph Borda, President